1  ROBBINS UMEDA LLP
2  BRIAN J. ROBBINS (190264)
   brobbins@robbinsumeda.com
3  FELIPE J. ARROYO (163803)
   farroyo@robbinsumeda.com
4  SHANE P. SANDERS (237146)
   ssanders@robbinsumeda.com
5  KEVIN S. KIM (275200)
   kkim@robbinsumeda.com
6  600 B Street, Suite 1900
   San Diego, CA 92101
7  Telephone: (619) 525-3990
   Facsimile: (619) 525-3991

8  Attorneys for Plaintiff

9

10              UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12                  SOUTHERN DIVISION

13  ERNESTO ESPINOZA, Derivatively      )  Case No.   **SACV11-01454 JVS (ANx)**
    on Behalf of HEWLETT-PACKARD        )
14  COMPANY,                            )
                                        )  VERIFIED SHAREHOLDER
15              Plaintiff,              )  DERIVATIVE COMPLAINT
         v.                             )
16                                      )
    LÉO APOTHEKER, ANN M.               )
17  LIVERMORE, CATHERINE A.             )
    LESJAK, RAYMOND J. LANE,            )
18  LAWRENCE T. BABBIO, JR.,            )
    JOHN H. HAMMERGREN, SÄRI            )
19  M. BALDAUF, G. KENNEDY              )
    THOMPSON, RAJIV L. GUPTA,           )
20  MARC L. ANDREESSEN,                 )
    SHUMEET BANERJI, GARY M.            )
21  REINER, PATRICIA F. RUSSO,          )
    DOMINIQUE SENEQUIER, and            )
22  MARGARET C. WHITMAN,                )
                                        )
23              Defendants,             )
         -and-                          )
24                                      )
    HEWLET-PACKARD COMPANY,             )
25  a Delaware corporation,             )
                                        )
26              Nominal Defendant.      )  DEMAND FOR JURY TRIAL

27

28

## NATURE AND SUMMARY OF THE ACTION

1.      This is a verified shareholder derivative action brought on behalf by plaintiff of nominal defendant Hewlett-Packard Company ("HP" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law.   These wrongs resulted in billions of dollars in damages to HP, in addition to damage to its reputation, goodwill, and standing in the business community.

2.      On August 6, 2010, HP shocked the investing public when it announced the resignation of its then Chief Executive Officer ("CEO"), Chairman, and President, Mark V. Hurd, after an investigation overseen by the Board of Directors (the "Board") determined that he violated the Company's standards of business conduct.   In the ensuing scandal, commentators routinely criticized the Board's handling of Mr. Hurd's resignation, with many pointing to the fact that it allowed Mr. Hurd to receive a severance worth tens of millions of dollars, despite apparently breaching his fiduciary duty.   Since that time, the Board has been desperate to show it can competently guide the Company.   Particular focus was given on Mr. Hurd's last big action at HP, the $1.2 billion acquisition of Palm, Inc. ("Palm").   HP's catalyst in buying Palm was its webOS operative system.   WebOS is a mobile operating system that worked with Palm's smartphones.   HP used webOS in its tablet computer, the "TouchPad," which was expected to compete with Apple Inc.'s ("Apple") extremely popular, iPad.

3.      Leading up to the TouchPad's release, HP's fiduciaries consistently touted its new release.   Defendant Léo Apotheker ("Apotheker"), Mr. Hurd's replacement, in particular, touted the TouchPad as ready for "prime time."   This "prime time" show, however, could not even make it through its first season.   A month and a half after its release, HP announced that it was closing its webOS business, including the TouchPad.   The announcement effectively admitted that the $1.2 billion dollar acquisition of Palm was a mistake.   Yet, this was not the only

shocking revelation.  HP also announced that it was looking to divest itself of its Personal Systems Group ("PSG") unit, the division of HP that makes personal computers.

4.    These announcements directly contradicted the Individual Defendants' (as defined herein) previous statements that HP's size and PSG unit were distinct advantages for the Company and that webOS would drive continued growth. Further, just two weeks before HP's startling announcement, the Board authorized the Company to repurchase of $10 billion worth of its own stock, the announcement of which boasted HP's stock price to over $37 per share.   The Board's decision to authorize the repurchase, announce it, and then have the Company immediately continue buying back its own stock is particularly troubling since the decision to kill webOS and spin or sell off the PSG unit must have received Board approval, and the Board must have known that this announcement would drive down the Company's stock.  Nevertheless, in July 2011, the Company bought back over $1 billion worth of its own stock at a time the Individual Defendants knew HP was about to make a major announcement that would drive down the stock price.   Thus, the Individual Defendants caused HP to waste hundreds of millions of dollars by paying inflated prices for its own stock.

5.    The Board's July 2011 repurchase authorization was on top of the $10 billion repurchase authorization the Board had already provided less than a year earlier.  All told, from December 2010 through July 2011, the Company purchased approximately $8.6 billion worth of its own stock at an average price of $38.82. As the Individual Defendants knew, or were recklessly unaware of, the Company was buying its own stock back at a time that it was artificially inflated due to their improper statements concerning the health of HP, in particular, the disastrous Palm acquisition.  Since the Company finally revealed the true state of its business, HP's stock has hovered under $24, $14 less than the average price the Company paid for its own stock.    Indeed,  since  February 16, 2011,  the  Company's  market

1  capitalization has plummeted $57.6 billion, a loss of over 54%. Adding to the

2  enormous amount of damages the Company has already incurred, HP is now the

3  subject of at least one securities fraud class action. The responsibility for this harm

4  lies with the Individual Defendants. Accordingly, in order to protect the Company,

5  plaintiff brings this action to hold the Individual Defendants accountable.

6                                    **JURISDICTION AND VENUE**

7          6.     This Court has jurisdiction in this case under Article III of the United

8  States Constitution and 28 U.S.C. section 1331 because of claims arising under the

9  Securities Exchange Act of 1934 (the "Exchange Act"). This Court has

10 supplemental jurisdiction pursuant to 28 U.S.C. section 1367(a) over all other

11 claims that are so related to claims in the action within such original jurisdiction

12 that they form part of the same case or controversy under Article III of the United

13 States Constitution. This action is not a collusive action designed to confer

14 jurisdiction on a court of the United States that it would not otherwise have.

15         7.     This Court retains general jurisdiction over each named defendant

16 who is a resident of California. Additionally, this Court has specific jurisdiction

17 over each named non-resident defendant because these defendants maintain

18 sufficient minimum contacts with California to render jurisdiction by this Court

19 permissible under traditional notions of fair play and substantial justice. HP

20 maintains operations in California. Moreover, defendants' conduct was

21 purposefully directed at California and arose in California, where HP maintains its

22 corporate headquarters. Exercising jurisdiction over the named non-resident

23 defendants is reasonable.

24         8.     Venue is proper in this Court pursuant to 28 U.S.C. section 1391(a)

25 because one or more of the defendants either resides in or maintains executive

26 offices in this District, a substantial portion of the transactions and wrongs

27 complained of herein, including the defendants' primary participation in the

28 wrongful acts detailed herein and aiding and abetting and conspiracy in violation

1   of fiduciary duties owed to HP occurred in this District, and defendants have

2   received substantial compensation in this District by doing business here and

3   engaging in numerous activities that had an effect in this District.

**THE PARTIES**

**Plaintiff**

6   9.    Plaintiff Ernesto Espinoza was a shareholder of HP at the time of the

7   wrongdoing complained of, has continuously been a shareholder since that time,

8   and is a current HP shareholder.

**Nominal Defendant**

10   10.    Nominal defendant HP is a Delaware corporation with its principal

11   executive offices located at 3000 Hanover Street, Palo Alto, California.  HP is

12   named in this Complaint as a nominal defendant solely in a derivative capacity,

13   and this shareholder derivative action is on its behalf.  HP is a leading global

14   provider of products, technologies, software, solutions, and services to individual

15   consumers, small- and medium-size businesses, and large enterprises, including

16   customers in the government, health, and education sectors.  HP has seven business

17   segments including Services, Enterprise Servers, Storage and Networking, HP

18   Software, the PSG, the Imaging and Printing Group, HP Financial Services, and

19   Corporate Investments.   HP completed its acquisition of Palm, a provider of

20   smartphones powered by the Palm webOS mobile operating system, in July 2010

**Defendants**

22   11.    Defendant Apotheker is HP's CEO, President, and a director and has

23   been since November 2010.  Defendant Apotheker knowingly, recklessly, or with

24   gross negligence made improper statements in the Company's press releases,

25   conference calls, and other public disclosures concerning its financial health and

26   business prospects that: (i) failed to disclose that the Company's business model

27   was not working and it could not leverage its extensive portfolio and scale of

28   products and services in a strategically beneficial manner; (ii) concealed the fact

- 4 -

1  that the webOS platform, including the TouchPad and webOS phones, and the

2  Company's PSG segment was not central to HP's business model, and contrary to

3  their assertions, webOS would not be integrated across the Company's entire

4  product line; (iii) failed to disclose that the inefficacy of TouchPad hardware

5  rendered the webOS operating system ineffective and unprofitable, as the webOS

6  system operated twice as fast on Apple's iPad 2 tablet compared to the TouchPad;

7  and (iv) failed to disclose that they had no reasonable basis to make positive

8  statements about the Company's financial results, future growth, and provide

9  aggressive guidance.  While HP's stock traded at artificially inflated prices due to

10 the foregoing improper statements, Apotheker authorized and implemented

11 repurchases of the Company's stock at these artificially inflated prices.  Apotheker

12 is also named as a defendant in a related securities class action complaint that

13 alleges he violated sections 10(b) and 20(a) of the Exchange Act.

14     12.    Defendant Ann M. Livermore ("Livermore") is an HP director and the

15 Interim Executive Vice President of HP Enterprise Services and has been since

16 June 2011.  Livermore was HP's Executive Vice President, HP Enterprise Business

17 from May 2004 to June 2011.  Livermore has served at HP in a variety of

18 leadership positions in marketing, sales, research and development, and business

19 management since joining the Company in 1982.  Livermore knowingly or

20 recklessly authorized the additional $10 billion to the Company's repurchase

21 program and allowed the Company to execute a repurchase of approximately $8.6

22 billion of its stock at artificially inflated prices.

23     13.    Defendant Catherine A. Lesjak ("Lesjak") is HP's Executive Vice

24 President and Chief Financial Officer and has been since January 2007.  Lesjak

25 was also HP's Interim CEO from August 2010 to November 2010; Senior Vice

26 President from 2003 to December 2006; and Treasurer from 2003 to March 2007.

27 Lesjak has served at HP for twenty-four years in a broad range of financial

28 leadership roles.  Lesjak knowingly, recklessly, or with gross negligence made

improper statements in the Company's press releases, conference calls, and other public disclosures concerning its financial health and business prospects that: (i) failed to disclose that the Company's business model was not working and it could not leverage its extensive portfolio and scale of products and services in a strategically beneficial manner; (ii) concealed the fact that the webOS platform, including the TouchPad and webOS phones, and the Company's PSG segment was not central to HP's business model, and contrary to their assertions, webOS would not be integrated across the Company's entire product line; (iii) failed to disclose that the inefficacy of TouchPad hardware rendered the webOS operating system ineffective and unprofitable, as the webOS system operated twice as fast on Apple's iPad 2 tablet compared to the TouchPad; and (iv) failed to disclose that they had no reasonable basis to make positive statements about the Company's financial results, future growth, and provide aggressive guidance.  Lesjak is also named as a defendant in a related securities class action complaint that alleges she violated sections 10(b) and 20(a) of the Exchange Act.

14.     Defendant Raymond J. Lane ("Lane") is HP's Chairman of the Board and has been since November 2010.  Lane knowingly or recklessly authorized the additional $10 billion to the Company's repurchase program and allowed the Company to execute a repurchase of approximately $8.6 billion of its stock at artificially inflated prices.

15.     Defendant Lawrence T. Babbio, Jr. ("Babbio") is an HP director and has been since 2002.  Babbio knowingly or recklessly authorized the additional $10 billion to the Company's repurchase program and allowed the Company to execute a repurchase of approximately $8.6 billion of its stock at artificially inflated prices.

16.     Defendant John H. Hammergren ("Hammergren") is an HP director and has been since 2005.  Hammergren knowingly or recklessly authorized the additional $10 billion to the Company's repurchase program and allowed the

1   Company to execute a repurchase of approximately $8.6 billion of its stock at
2   artificially inflated prices.

3        17.   Defendant Sari M. Baldauf ("Baldauf") is an HP director and has been
4   since 2006.  Baldauf is also a member of HP's Audit Committee and has been since
5   at least January 2010.  Baldauf was a member of HP's Technology Committee
6   from at least January 2010 to at least February 2011.  Baldauf knowingly or
7   recklessly allowed the Company to make improper statements that: (i) failed to
8   disclose that the Company's business model was not working and it could not
9   leverage its extensive portfolio and scale of products and services in a strategically
10  beneficial manner; (ii) concealed the fact that the webOS platform, including the
11  TouchPad and webOS phones, and the Company's PSG segment was not central to
12  HP's business model, and contrary to their assertions, webOS would not be
13  integrated across the Company's entire product line; (iii) failed to disclose that the
14  inefficacy of TouchPad hardware rendered the webOS operating system ineffective
15  and unprofitable, as the webOS system operated twice as fast on Apple's iPad 2
16  tablet compared to the TouchPad; and (iv) failed to disclose that they had no
17  reasonable basis to make positive statements about the Company's financial results,
18  future growth, and provide aggressive guidance.  Baldauf also knowingly or
19  recklessly authorized the additional $10 billion to the Company's repurchase
20  program and allowed the Company to execute a repurchase of approximately $8.6
21  billion of its stock at artificially inflated prices.

22       18.   Defendant G. Kennedy Thompson ("Thompson") is an HP director
23  and has been since 2006.  Thompson is also Chairman of HP's Audit Committee
24  and has been since at least September 2011 and a member of that committee and
25  has been since at least January 2010. Thompson knowingly or recklessly allowed
26  the Company to make improper statements that: (i) failed to disclose that the
27  Company's business model was not working and it could not leverage its extensive
28  portfolio and scale of products and services in a strategically beneficial manner;

- 7 -

(ii) concealed the fact that the webOS platform, including the TouchPad and webOS phones, and the Company's PSG segment was not central to HP's business model, and contrary to their assertions, webOS would not be integrated across the Company's entire product line; (iii) failed to disclose that the inefficacy of TouchPad hardware rendered the webOS operating system ineffective and unprofitable, as the webOS system operated twice as fast on Apple's iPad 2 tablet compared to the TouchPad; and (iv) failed to disclose that they had no reasonable basis to make positive statements about the Company's financial results, future growth, and provide aggressive guidance. Thompson also knowingly or recklessly authorized the additional $10 billion to the Company's repurchase program and allowed the Company to execute a repurchase of approximately $8.6 billion of its stock at artificially inflated prices.

19.    Defendant Rajiv L. Gupta ("Gupta") is an HP director and has been since 2009. Gupta is also a member of HP's Audit Committee and has been since at least September 2011. Gupta was a member of HP's Technology Committee from at least January 2010 to at least February 2011. Gupta knowingly or recklessly authorized the additional $10 billion to the Company's repurchase program and allowed the Company to execute a repurchase of approximately $8.6 billion of its stock at artificially inflated prices.

20.    Defendant Marc L. Andreessen ("Andreessen") is an HP director and has been since 2009. Andreessen is also Chairman of HP's Technology Committee and has been since at least January 2010. Andreessen knowingly or recklessly authorized the additional $10 billion to the Company's repurchase program and allowed the Company to execute a repurchase of approximately $8.6 billion of its stock at artificially inflated prices.

21.    Defendant Shumeet Banerji ("Banerji") is an HP director and has been since January 2011. Banerji is also a member of HP's Audit Committee and has been since February 2011. Banerji knowingly or recklessly allowed the Company

to make improper statements that: (i) failed to disclose that the Company's business model was not working and it could not leverage its extensive portfolio and scale of products and services in a strategically beneficial manner; (ii) concealed the fact that the webOS platform, including the TouchPad and webOS phones, and the Company's PSG segment was not central to HP's business model, and contrary to their assertions, webOS would not be integrated across the Company's entire product line; (iii) failed to disclose that the inefficacy of TouchPad hardware rendered the webOS operating system ineffective and unprofitable, as the webOS system operated twice as fast on Apple's iPad 2 tablet compared to the TouchPad; and (iv) failed to disclose that they had no reasonable basis to make positive statements about the Company's financial results, future growth, and provide aggressive guidance.   Banerji also knowingly or recklessly authorized the additional $10 billion to the Company's repurchase program and allowed the Company to execute a repurchase of approximately $8.6 billion of its stock at artificially inflated prices.

22.   Defendant Gary M. Reiner ("Reiner") is an HP director and has been since January 2011.  Reiner is also a member of HP's Technology Committee and has been since March 2011.   Reiner knowingly or recklessly authorized the additional $10 billion to the Company's repurchase program and allowed the Company to execute a repurchase of approximately $8.6 billion of its stock at artificially inflated prices.

23.   Defendant Patricia F. Russo ("Russo") is an HP director and has been since January 2011.  Russo is also a member of HP's Technology Committee and has been since March 2011.   Russo knowingly or recklessly authorized the additional $10 billion to the Company's repurchase program and allowed the Company to execute a repurchase of approximately $8.6 billion of its stock at artificially inflated prices.

24.     Defendant Dominique Senequier ("Senequier") is an HP director and has been since January 2011.   Senequier is also a member of HP's Audit Committee and has been since February 2011.   Senequier knowingly or recklessly allowed the Company to make improper statements that: (i) failed to disclose that the Company's business model was not working and it could not leverage its extensive portfolio and scale of products and services in a strategically beneficial manner; (ii) concealed the fact that the webOS platform, including the TouchPad and webOS phones, and the Company's PSG segment was not central to HP's business model, and contrary to their assertions, webOS would not be integrated across the Company's entire product line; (iii) failed to disclose that the inefficacy of TouchPad hardware rendered the webOS operating system ineffective and unprofitable, as the webOS system operated twice as fast on Apple's iPad 2 tablet compared to the TouchPad; and (iv) failed to disclose that they had no reasonable basis to make positive statements about the Company's financial results, future growth, and provide aggressive guidance.   Senequier also knowingly or recklessly authorized the additional $10 billion to the Company's repurchase program and allowed the Company to execute a repurchase of approximately $8.6 billion of its stock at artificially inflated prices.

25.     Defendant Margaret C. Whitman ("Whitman") is an HP director and has been since January 2011.   Whitman is also a member of HP's Technology Committee and has been since March 2011.   Whitman knowingly or recklessly authorized the additional $10 billion to the Company's repurchase program and allowed the Company to execute a repurchase of approximately $8.6 billion of its stock at artificially inflated prices.

26.     The defendants identified in ¶¶11-13 are referred to herein as the "Officer Defendants."   The defendants identified in ¶¶11-12, 14-25 are referred to herein as the "Director Defendants."   The defendants identified in ¶¶17-19, 21, 24 are referred to herein as the "Audit Committee Defendants."   The defendants

1  identified in ¶¶17, 19-20, 22-23, 25, are referred to herein as the "Technology

2  Committee Defendants".  Collectively, the defendants identified in ¶¶11-25 are

3  referred to herein as the "Individual Defendants."

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

5  **Fiduciary Duties**

6      27.    By reason of their positions as officers, directors, and/or fiduciaries of

7  HP and because of their ability to control the business and corporate affairs of HP,

8  the Individual Defendants owed and owe HP and its shareholders fiduciary

9  obligations of trust, loyalty, good faith, and due care, and were and are required to

10  use their utmost ability to control and manage HP in a fair, just, honest, and

11  equitable manner.  The Individual Defendants were and are required to act in

12  furtherance of the best interests of HP and its shareholders so as to benefit all

13  shareholders equally and not in furtherance of their personal interest or benefit.

14      28.    Each officer and director of the Company owes to HP and its

15  shareholders the fiduciary duty to exercise good faith and diligence in the

16  administration of the affairs of the Company and in the use and preservation of its

17  property and assets, and the highest obligations of fair dealing.  In addition, as

18  officers and/or directors of a publicly held company, the Individual Defendants had

19  a duty to promptly disseminate accurate and truthful information with regard to the

20  Company's operations, performance, management, projections, and forecasts so

21  that the market price of the Company's stock would be based on truthful and

22  accurate information.

23  **Additional Duties of the Audit Committee Defendants**

24      29.    In addition to these duties, under its Charter in effect since 2010, the

25  Audit Committee Defendants, defendants Baldauf, Banerji, Gupta, Senequier, and

26  Thompson, owed specific duties to HP to review and approve the Company's

27  earnings press releases, guidance, and quarterly and annual financial statements.

28  The Audit Committee's Charter provides in relevant part:

- 11 -

Meet to review and discuss with management and the independent registered public accounting firm HP's annual audited and quarterly financial statements, including HP's disclosures in"Management's Discussion and Analysis of Financial Condition and Results of Operations."

\* \* \*

Earnings Press Releases, Corporate Policies and Earnings Guidance. The Committee will review and discuss earnings press releases (paying particular attention to the use of "pro forma," or "adjusted" non-GAAP information), as well as corporate policies with respect to financial information and earnings guidance provided to analysts and ratings agencies.

\* \* \*

Internal Controls. The Committee will review the adequacy and effectiveness of HP's internal controls, including any significant deficiencies in such controls and significant changes or material weaknesses in such controls reported by the independent registered public accounting firm, the internal auditors or management, any special audit steps adopted in light of material control deficiencies, and any fraud, whether or not material, that involves management or other HP employees who have a significant role in such controls

**Additional Duties of the Technology Committee Defendants**

30.    In addition to the duties listed above, under its Charter in effect since 2010, the Technology Committee Defendants, defendants Andreessen, Baldauf, Gupta, Reiner. Russo, and Whitman, owed specific duties to HP to assess the Company's technology development strategies and the scope and quality of HP's

1  intellectual property.  The Company describes the Technology Committee's duties

2  as:

> The Technology Committee makes recommendations to the Board as
> to scope, direction, quality, investment levels and execution of HP's
> technology strategies; oversees the execution of technology strategies
> formulated by management; provides guidance on technology as it
> may pertain to, among other things, market entry and exit,
> investments, mergers, acquisitions and divestitures, new business
> divisions and spin-offs, research and development investments, and
> key competitor and partnership strategies; and reviews and makes
> recommendations on proposed investment, acquisition, joint venture
> and divestiture transactions with a value of at least $200 million that
> involve technology prior to any review by other Board Committees or
> the Board pursuant to HP's M&A approval policies.

31.    Accordingly, the Technology Committee Defendants would have specific knowledge about the Company's failure to receive value from the Palm acquisition and decision to divest HP of its entire PSG unit.

**Control, Access, and Authority**

32.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of HP, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

33.    Because of their advisory, executive, managerial, and directorial positions with HP, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and growth prospects of HP.  While in possession of this material, non-public information, the Individual Defendants made improper representations regarding the Company, including

- 13 -

1  information regarding HP's decision to shut down the Company webOS
2  developments, including the TouchPad, and divestiture of the PSG unit.

3  34. At all times relevant hereto, each of the Individual Defendants was the
4  agent of each of the other Individual Defendants and of HP, and was at all times
5  acting within the course and scope of such agency.

6  **Reasonable and Prudent Supervision**

7  35. To discharge their duties, the officers and directors of HP were
8  required to exercise reasonable and prudent supervision over the management,
9  policies, practices, and controls of the financial affairs of the Company. By virtue
10  of such duties, the officers and directors of HP were required to, among other
11  things:

12  (a) properly and accurately guide investors and analysts as to the
13  true financial condition of the Company at any given time, including making
14  accurate statements about the Company's financial health;

15  (b) ensure that the Company complied with its legal obligations
16  and requirements, including acting only within the scope of its legal authority and
17  disseminating truthful and accurate statements to the investing public;

18  (c) refrain from acting upon material, inside corporate information
19  to benefit themselves;

20  (d) conduct the affairs of the Company in an efficient, business-like
21  manner so as to make it possible to provide the highest quality performance of its
22  business, to avoid wasting the Company's assets, and to maximize the value of the
23  Company's stock;

24  (e) remain informed as to how HP conducted its operations, and,
25  upon receipt of notice or information of imprudent or unsound conditions or
26  practices, make reasonable inquiry in connection therewith, and take steps to
27  correct such conditions or practices and make such disclosures as necessary to
28  comply with securities laws; and

- 14 -

(f)   ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**Breaches of Duties**

36.   Each Individual Defendant, by virtue of his or her position as an officer and/or director, owed to the Company and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of HP, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.   The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of HP's Board.

37.   The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to dramatically overpay for its own stock at the same time the Company's stock was inflated due to the improper statements detailed herein.   The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.   In addition, as a result of defendants' illegal actions and course of conduct, the Company is now the subject of a class action lawsuit that alleges violations of securities laws.   As a result, HP has expended, and will continue to expend, significant sums of money.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

38.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of

their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

39.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of HP, regarding the Individual Defendants' management of HP's operations; and (ii) enhance the Individual Defendants' executive and directorial positions at HP and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

40.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

41.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

42.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

43.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## THE FALSE AND MISLEADING STATEMENTS

44.     On November 22, 2010, HP issued a press release announcing its fourth quarter and fiscal year 2010 financial results.  The Company reported net income of $2.5 billion, or $1.10 diluted earnings per share ("EPS"), and net revenue of $33.3 billion for the fourth fiscal quarter ended October 31, 2010.  Additionally, the Company reported fiscal year 2010 net revenue of $126 billion.  The Company provided guidance for its first quarter of fiscal 2011 of revenue in the range of $32.8 to $33 billion and diluted EPS in the range of $1.06 to $1.08 per share.  The Company further provided guidance for the full year fiscal 2011 of revenue in the range of $132 to $133.5 billion, and diluted EPS in the range of $4.42 to $4.52 per share.  The release stated in part:

> "HP proved once again that it is able to execute given its market strengths and technology leadership," said Léo Apotheker, HP president and chief executive officer. "I have seen firsthand that we have talented people who are focused on delivering value for our customers. Our market opportunity is vast, and I am confident that we will extend our leadership into the future."

45.     After releasing its fourth quarter fiscal 2010 financial results on November 22, 2010, HP hosted an analyst conference call.  During the call, defendant Apotheker provided additional color on why he thought he would "extend [his] leadership into the future."  In particular, he stated:

HP has many strengths, and it's actually a formidable Company.   To name just a few of these strengths, I'd like to say the breadth of our technology portfolio, our scale, our people, our customer relationships, and our operational excellence.   I do believe that our greatest strength is actually our opportunities.   ***Given our size and breadth, we have a unique position in the market to expand, to do way more business in emerging markets, to become more of a solution provider for our customers, and to leverage our own technology better across the entire Company***.   And you should bear in mind, that our technology trends are morphing, and they are morphing rapidly.

We, at HP, have the opportunity to grow our leadership position. We're addressing the cloud in many ways, an example, converged infrastructure, and ***we are addressing mobility with webOS***.   So all of these are fantastic opportunities that we are looking at.

46.   On February 9, 2011, six months after HP closed its acquisition of Palm, *Bloomberg* issued an article entitled "HP Unveils Palm-Based Tablet Computer, Smartphones," which stated in part:

Hewlett-Packard Co. unveiled a tablet computer called the TouchPad in a bid to gain a foothold in the market for handheld computers, and said the product's software, acquired in last year's purchase of Palm Inc., will run on personal computers this year.

HP, the world's largest maker of PCs, showed off the TouchPad and smartphones dubbed Veer and Pre 3 at an event in San Francisco today. The company will deliver PCs and printers running WebOS, originally designed for touch-screen devices, to attract more software

developers to the platform and expand HP's market, Palm chief Jon Rubinstein said in an interview.

"That's going to have a huge influence on the installed base," Rubinstein said. "Our long-term goal is to deliver a connected experience to all of our customers. You get a unified experience across all your devices."

47.    On February 22, 2011, HP issued a press release announcing its first fiscal quarter 2011 financial results.  The Company reported net earnings of $2.6 billion, or $1.17 diluted EPS, and net revenue of $32.3 billion for the first quarter ended January 31, 2011.  The Company provided guidance for its second quarter of fiscal 2011 of revenue in the range of $31.4 to $31.6 billion, and diluted EPS in the range of $0.99 to $1.01 per share.   The Company further provided revised guidance for fiscal 2011 of revenue in the range of $130 to $131.5 billion, and diluted EPS in the range of $4.46 to $4.54 per share.  The release stated in part:

"I'm pleased with our EPS and margin expansion during the quarter. Going forward, we have the opportunity to further capitalize on our customers' demands for higher value-added solutions," said Léo Apotheker, HP president and chief executive officer.  "HP has a powerful portfolio, including exciting, recently announced cloud and connectivity offerings.  We are focused on leveraging these strengths to extend our leadership and accelerate growth."

48.    After releasing its first quarter fiscal 2011 financial results on February 22, 2011, HP hosted a conference call during which defendants represented the following:

[LESJAK:] *[I]n terms of the guidance, there is no question that we are being prudent and we're remaining cautious about the environment for consumer PCs.* There's – I mentioned that earlier. In terms of the second half of the year, the reason why you see better than normal seasonality, half over half, is that we do expect to continue to recover, that in PSG, especially in China. We also expect improvement in the short-term signings based on the actions that we're taking in the services space. *And finally, in the second half of the year, we'll also benefit from the launch of our new webOS family of products.* And so I think that, that just shows what happens in the second half.

* * *

[APOTHEKER:] Let me maybe add one comment to what Cathie has said. *We have been looking very hard at our forecast and I can just confirm that we are very confident in our ability to deliver the updated fiscal year '11 outlook.* It's beyond the points that Cathie has already made. We see strength in our other businesses and we have scrubbed these numbers long and hard and we believe that these are the right numbers.

49.     On March 1, 2011, defendant Lesjak participated in a Morgan Stanley Technology, Media & Telecom Conference, during which she stated:

*I think it's important for you all to understand that we have a lot of confidence in our ability to deliver our outlook for fiscal 2011.* In Q1 we grew revenue 4%. We grew earnings per share 27%. We grew cash flow from operations 28%.

- 20 -

So we know how to manage this business in a variety of revenue environments. And I think that's really important.

Our model's intact, we've got the operational discipline to continue to expand margins, operating margins kind of year over year. I think that it's important when you think about the guidance we have provided, we did take revenue down as you know $2 billion for the fiscal year.

Again, it's roughly three quarters from PSG and about a quarter from services. *Frankly if we didn't have confidence in that revenue, we would've taken revenue down further.* The difference to you all of $2 billion or $2.5 billion is just not meaningful. So at the end of the day, *we have the confidence in the revenue outlook we provided*.

50.     On March 14, 2011, during an analyst conference call, defendant Apotheker continued to tout the Company's diverse consumer products. In particular he stated:

At HP, our vision is to provide seamless, secure, context-aware experiences for a connected world, everybody on.

For those who know me, my passion is using technology to help customers succeed. The primary reason I came to HP is that I recognized a remarkable opportunity for this company to shape the future of information technology and deliver unprecedented value for our customers.

*   *   *

*We have the industry's best and broadest portfolio, spanning servers, networking, storage, software, outsourcing, application, and*

***consulting services, desktops, notebooks, tablets, and printers and I'm not even being exhaustive.***   We have market leadership in virtually every category where we compete from the consumer to the enterprise.  Our reach and scale are unmatched.  And we leverage it with the products we ship and the companies we acquire.  3Com and 3PAR are great examples.   And HP is one of the world's most powerful brands with a reputation that opens doors in any market around the world.

Together, these assets add up to an incredible opportunity for HP and a compelling value proposition for our customers, shareholders, and employees.  Yes, HP is strong, but we also recognize that the world around us is changing faster than ever.   Powerful trends, like consumerization, cloud computing, and connectivity are redefining the way people live, businesses operate, and the way the world works.  There is an expanding relationship between people and information.  The old paradigm of one person with separate consumer and professional life is over. People want a seamless, secure, context-aware experience at home, at work, at play, or on the road.

*   *   *

As you move up to devices, we're also extremely powerful. HP ships two PCs and two printers a second. ***Our number one market position in printers, desktops, and notebooks gives us an enormous installed base which continues to grow.  The fact is people like working on PCs and that isn't going to go away***.  And people like and need to print.  Just look at the fast-growing geographies like Brazil.  As they come online and join the connected world, they can jump into any form factor and they do, including PCs and printers.

- 22 -

They are, in fact, the fastest growing market for our connected devices by far. *So, traditional technology is something we know, where we compete and win, where we know how to partner, where we create a lot of value. And we will continue to enhance our core capabilities to strengthen our positions.* And, all of this is, of course, is important. It is the core of our business, but just as important, is how our current assets position us for the future of technology, to deliver the seamless, secure, context-aware experiences for the connected world. Because, just as the forces of cloud and connectivity are changing the model for people's relationships to information, beneath that is a changing model of technology, architecture, delivery and consumption.

51.   Also on March 14, 2011, HP hosted a press conference for media representatives. During this conference, defendant Apotheker highlighted webOS and its advantages, stating:

So *webOS is an unbelievably attractive and stunning technology*. The devices we have been able to put on display on February 9 have in themselves a certain set of characteristics that make them unique. *There is interconnectivity, the fact that they are seamless, they connect seamlessly to each other, and some of the other technology features of webOS make it into an outstanding web operating system.*

So *we will be shipping this, first of all, on the dedicated devices, smartphones and the tablet.* The Touch, our tablet, will come out – the Touch pad will come out in June and from that day onwards there will be wave after wave of technology coming out to support the webOS platform.

There will be a beta version for webOS running on a browser on PCs available at the end of the year and you will see us putting webOS on the (inaudible) technology on PCs, on Windows PCs I should add, starting from that point onwards.  And we hope to reach 100 million devices a year.

*We will put the same technology on our printers.  We will put them on PCs.  We will put them on touch pads.  We will put them on smartphones so you will see this to become a very massive, very broad platform.*

52.    On May 17, 2011, HP issued a press release announcing its second fiscal quarter 2011 financial results.  The Company reported net earnings of $2.3 billion, or $1.05 diluted EPS, and net revenue of $31.6 billion for the second quarter ended April 30, 2011.  The Company provided guidance for its third quarter of fiscal 2011 of revenue in the range of $31.1 to $31.3 billion, and diluted EPS in the range of approximately $0.90 per share.  The Company further provided revised guidance for fiscal 2011 of revenue in the range of $129 to $130 billion, and diluted EPS in the range of at least $4.27 per share.  The release stated in part:

"HP executed well and delivered a solid quarter," said Léo Apotheker, HP president and chief executive officer.  "Our enterprise strategy, with services at its core, is focused on higher value-added solutions. Today we are accelerating our efforts to align our services business model to our long-term strategy to deliver unprecedented value to our customers and a better return for our shareholders."

53.    After releasing its second fiscal quarter 2011 financial results on May 17, 2011, HP hosted a conference call during which defendant Apotheker stated that HP continued to see growth in personal computers ("PCs") and that PCs and

touch pads were a "great opportunity for HP. The following exchanges occurred during the conference call:

> [ANALYST:]     Léo , you talked in your opening remarks about companies that will fail because they protect legacy businesses. And with two guidance resets in a row, is it time, in your view, for HP to reconsider whether you really need to participate in some of the businesses that are dragging down performance? Or do you think you can invest fast enough in new growth segments to offset declines that we are seeing like in PCs right now?

> [APOTHEKER:]  At HP, we do a high (inaudible) portfolio review to assess the performance of each one of our businesses. We assess these businesses according to their contribution to the business and their contribution to our strategy and the value it can generate to our customers.

> It's interesting that you point out PCs. If you look at the performance of PCs, it has a two-phased approach and a two-phased execution. *On the one hand, on the commercial side, we see a continuous demand for PCs, 12% growth.*   Again, we are the market leader in this business. And we see some weakness on the consumer side.

> We believe that we have a great strategy to execute towards our connectivity approach, and we are very excited about our TouchPads coming out in particular in the summer. *And as we all believe that there will be a convergence of these different form factors over time – TouchPads, PCs, et cetera, and in particular, notebooks – we believe this is a great opportunity for HP to participate in this.*  Of course we will continue to assess the value of each element in the

1   portfolio as we continue to look at our business, but right now, I
2   believe we have a balanced portfolio.

3   54.   On June 2, 2011, defendant Apotheker participated at a Sanford C.
4   Bernstein & Co. Strategic Decisions Conference.  During his speech, Apotheker
5   again touted webOS as "ready for prime time."  In particular, he stated:

6
7   [APOTHEKER:]  So the good news on the PC business is the
    commercial side of the house, or the non-consumer side.  That
8   business is growing double-digit, continues to grow double-digit, is
9   doing really well.
10
                                    *   *   *
11
12  We see some trends affecting the PC business. Some people talk about
13  the tablet effect.  Some other people are talking about the economic
14  impact.  I think both are a little bit impacting the consumer.  I believe,
15  over time, there are some really interesting opportunities that are
16  opening up that didn't exist in the PC business in the past, which is to
17  create, again, innovation in the PC industry.
18
                                    *   *   *
19
20  **The other thing we are doing really well on the PSG side of the**
21  **house is webOS. So webOS is ready for prime time.  It's now out on**
22  **a small phone, the Veer.  And it will be out on the format of the**
23  **tablet by the end of June/early July.   And it will go into distribution**
24  **then.  We are all about webOS**.  We are more than about this with the
25  other form factor. And I am happy to reconfirm that webOS will be
26  available on PCs, on top of Windows, which creates a whole new
27  market dynamic for…
28

- 26 -

[ANALYST:]      Do you have a date for that? webOS on the PC?

[APOTHEKER:]   *2012*. I know there are 12 months in 2012, even in Germany. *And then we have – and we are going to put webOS also on printers. So we can create the kind of a platform of about 100 million, 110 million devices a year*. And by the way, we won't shy away from licensing webOS to others if that opportunity arises.

### THE TRUTH EMERGES

55.    Then, on August 18, 2011, barely two months after defendant Apotheker declared webOS ready for "prime time," HP issued a press release announcing disappointing third fiscal quarter 2011 financial results, as well as a major change of direction for the Company, including discontinuing operations for webOS devices.   The Company reported net earnings of $1.9 billion, or $0.93 diluted EPS, and net revenue of $31.2 billion for the third quarter ended July 31, 2011.   The Company additionally issued revised guidance for fiscal year 2011, once again reducing its revenue guidance, this time to a range of $127.2 to $127.6 billion, versus previous guidance of $129 to $130 billion, and its diluted EPS guidance to a range of $3.59 to $3.70 per share, versus previous guidance of at least $4.27 per share.   HP further announced several important shifts in its long-term business model.   First, it was purchasing enterprise content management and search vendor Autonomy Corporation for $10.3 billion, agreeing to pay a 64% premium for the company over its prior closing day price.   Second, the Company announced it was exploring strategic alternatives for its PSG segment, including potentially selling or spinning off its profitable PC division.   Third, the Company announced that it "will discontinue operations for webOS devices, specifically the TouchPad and webOS phones."

56.   On August 19, 2011, *CRN* issued an article entitled "HP Partners Startled by TouchPad's Demise, Uncertain WebOS Future." The article provided in part:

> Chris Barnes, vice president of research and solutions development at Gap Intelligence, a San Diego-based research firm that follows HP, wonders if the HP brass really believed the WebOS talking points. "WebOS was such a linchpin of the company's overarching strategy; it was the virtual glue that tied together phones, PCs, tablets, printers," Barnes said. "It really makes you wonder whether HP's senior leadership ever really believed its own story about developing its own self-supporting ecosystem, vis-a-vis Apple. *[It] sounds more like they were dishing out the Kool-Aid but secretly drinking iced tea.*"

57.   The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)   HP's business model was not working.  The Company was unable to leverage its extensive portfolio and scale of products and services in a strategically beneficial manner;

(b)   WebOS, the TouchPad, and the PC business were not central to HP's business model and webOS would not be integrated across the Company's entire product line;

(c)   The TouchPad hardware was inefficient, limiting the degree of effectiveness of the webOS operating system.  In fact, webOS operated twice as fast when loaded onto Apple's iPad 2 tablet compared to the TouchPad; and

(d)   Based on the foregoing, defendants lacked a reasonable basis for their positive statements about HP's turnaround, revenue growth rates, market

1 share, new product introductions, diluted EPS, and the Company's ability to deliver

2 upon its long-term growth model.

3 ## THE FRAUDULENT REPURCHASES

4     58.    While the Individual Defendants made improper statements that had

5 the effect of artificially inflating the Company stock, defendants directed or

6 permitted the Company to materially overpay for its own stock through the

7 repurchases detailed herein.   On August 29, 2010, defendants Babbio,

8 Hammergren, Baldauf, Thompson, Gupta, and Andreessen authorized the

9 Company to repurchase $10 billion of its own stock.  Then, on July 21, 2011,

10 defendants Apotheker, Livermore, Lane, Babbio, Hammergren, Baldauf,

11 Thompson, Gupta, Andreessen, Banerji, Reiner, Russo, Senequier, and Whiteman

12 inexplicably authorized an additional $10 billion to the Company's stock

13 repurchase program that still had $5.9 billion of repurchase authorization

14 remaining.   The Board caused the Company to repurchase approximately $8.6

15 billion of the Company's bloated stock between December 2010 to July 2011.  As

16 detailed below, defendants caused the Company to effect eight repurchases of the

17 Company's stock at artificially inflated prices, the last of which was a staggering

18 $1.1 billion repurchase in July 2011, which was a mere month before the Company

19 issued disappointing third quarter 2011 financial results and announced a drastic

20 change in Company policy that discontinued certain operations of its webOS

21 devices.

| Date of Board Authorization Repurchase Program | Period | Repurchased Shares | Average Price Per Share | Approximate Aggregate Cost |
|---|---|---|---|---|
| August 29, 2010 | - | - | - | - |
| | Dec-10 | 23,347,000 | $42.10 | $982,908,700 |
| | Jan-11 | 6,323,000 | $44.67 | $282,448,410 |
| | Feb-11 | 4,541,000 | $47.14 | $214,062,740 |
| | Mar-11 | 35,267,000 | $42.46 | $1,497,436,820 |

| | | | | |
|---|---|---|---|---|
| | Apr-11 | 23,899,000 | $40.78 | $974,601,220 |
| | May-11 | 38,091,000 | $37.44 | $1,426,127,040 |
| | Jun-11 | 59,658,000 | $35.71 | $2,130,387,180 |
| July 21, 2011 | Jul-11 | 30,214,000 | $35.88 | $1,084,078,320 |
| **Total:** | | **221,340,000** | **$38.82** | **$8,592,050,430** |

59.     Prior to authorizing and executing these costly repurchases, these defendants knew or recklessly disregarded the fact that the value of the Company was inflated due to the false and misleading statements disseminated concerning its business prospects following the Palm acquisition.  After defendants announced the additional $10 billion in repurchase authorization, trading in HP stock catapulted to over $37 per share.  However, less than a month later, the Company shockingly disclosed that it would sell or spin-off its profitable PSG segment and that it was scrapping plans to launch its new webOS platform.  By the time the Company announced the repurchase authorization and executed the $1.1 billion repurchase in July 2011, the Board must have already approved the decision to discontinue its webOS platform and sell or spin-off the PSG unit, and defendants must have known that this forthcoming announcement would cause the Company's stock to nosedive. Nevertheless, these defendants allowed the Company to deplete its assets by paying heavy premiums to repurchase its own stock, fully aware that their imminent announcement exposing the disastrous result of the Palm acquisition would cause the Company's stock to drop significantly.

60.     In all, defendants caused the Company to repurchase approximately 221,340,000 shares of its stock at a whopping aggregate cost to the Company of approximately $8.6 billion.   Under the Individual Defendants' purview, the Company bought back its shares at a weighted average price of $38.82. Tellingly, the weighted average repurchase price was substantially higher than HP's share price of $23.60, the day after the truth was revealed.  As the previously artificially inflated Company stock precipitously dropped to represent the true value of HP, the Company incurred real economic loss arising from the approximately

1  221,340,000 shares of HP stock the Company repurchased at inflated prices of

2  about $38.82 per share authorized and implemented by the Individual Defendants.

3  **DAMAGES TO HP**

4  61.   As a result of the Individual Defendants' improprieties, HP

5  disseminated improper, public statements.   These improper statements have

6  devastated HP's credibility as reflected by the Company's $57.6 billion, or 54%,

7  market capitalization loss.

8  62.   Further, as a direct and proximate result of the Individual Defendants'

9  actions, HP has expended, and will continue to expend, significant sums of money.

10  Such expenditures include, but are not limited to:

11  (a)   costs incurred from defending and paying any settlement in the

12  class actions for violations of federal securities laws;

13  (b)   costs incurred from overpaying for its own stock at artificially

14  inflated prices; and

15  (c)   costs incurred from compensation and benefits paid to the

16  defendants who have breached their duties to HP.

17  63.   Moreover, these actions have irreparably damaged HP's corporate

18  image and goodwill.   For at least the foreseeable future, HP will suffer from what

19  is known as the "liar's discount," a term applied to the stocks of companies who

20  have been implicated in improper behavior and have misled the investing public,

21  such that HP's ability to raise equity capital or debt on favorable terms in the future

22  is now impaired.

23  **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

24  64.   Plaintiff brings this action derivatively in the right and for the benefit

25  of HP to redress injuries suffered, and to be suffered, by HP as a direct result of

26  breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as

27  well as the aiding and abetting thereof, by the Individual Defendants.  HP is named

28

1   as a nominal defendant solely in a derivative capacity.  This is not a collusive

2   action to confer jurisdiction on this Court that it would not otherwise have.

3       65.   Plaintiff will adequately and fairly represent the interests of HP in

4   enforcing and prosecuting its rights.

5       66.   Plaintiff was a shareholder of HP at the time of the wrongdoing

6   complained of, has continuously been a shareholder since that time, and is a

7   current HP shareholder.

8       67.   The current Board of HP consists of the following fourteen

9   individuals: defendants Andreessen, Apotheker, Babbio, Baldauf, Banerji, Gupta,

10  Hammergren, Lane, Livermore, Reiner, Russo, Senequier, Thompson, and

11  Whitman.  Plaintiff has not made any demand on the present Board to institute this

12  action because such a demand would be a futile, wasteful, and useless act, as set

13  forth below.

14  **Demand Is Excused Because the Director Defendants' Conduct Is Not a Valid**

15  **Exercise of Business Judgment**

16      68.   Defendants Andreessen, Apotheker, Babbio, Baldauf, Banerji, Gupta,

17  Hammergren, Lane, Livermore, Reiner, Russo, Senequier, Thompson, and

18  Whitman's decision to authorize the $10 billion repurchase on July 21, 2011, is not

19  protected by the business judgment rule.  At the time of this decision, these

20  defendants were at a minimum grossly negligent in authorizing a massive

21  repurchase at the same time that the Company was set to announce a major

22  decision that knew would decrease the Company's stock price, namely, the

23  decision to stop making webOS products and potentially exit the entire consumer

24  business through a sale or spin-off of the PSG unit.  This decision, coupled with

25  the announcement of the Board's authorization of the $10 billion repurchase serve

26  to further artificially inflate the Company's stock.  Nevertheless, not only did the

27  Board authorize the additional repurchase, it allowed the Company to continue to

28  purchase its stock at artificially inflated prices.  In fact, in July 2011, HP acquired

1   over $1 billion of its own stock, at the same time that the Individual Defendants,

2   including the Board, knew that the Company would soon announce that it was

3   exiting the consumer business and that its $1.2 billion purchase of Palm was a

4   failure.   Such a reckless disregard of the Company's assets is at a minimum a

5   breach of the Board's duty of care.  Accordingly, the Board's decision to authorize

6   the repurchase is not protected by the business judgment rule.   Therefore, demand

7   is futile.

8   **Demand Is Excused Because Defendants Apotheker, Andreessen, Babbio,**
    **Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo,**
9   **Senequier, Thompson, and Whitman Face a Substantial Likelihood of**
    **Liability for Their Misconduct**
10

11        69.    As alleged above, defendant Apotheker faces a substantial likelihood

12   of liability for his violation of section 10(b) of the Exchange Act and breaching his

13   fiduciary duty.   Apotheker, as CEO of HP, was ultimately responsible for the

14   Company's operations, financial statements, and internal controls.   However, in

15   complete abdication of his fiduciary duties, Apotheker knowingly or extremely

16   recklessly made the improper statements regarding the Company's financial results

17   and business prospects.   Accordingly, because Apotheker faces a substantial

18   likelihood of liability for violations of federal securities law, demand upon him is

19   futile.

20        70.    Defendants Apotheker, Andreessen, Babbio, Baldauf, Banerji, Gupta,

21   Hammergren, Lane, Livermore, Reiner, Russo, Senequier, Thompson, and

22   Whitman face a substantial likelihood of liability for violation of section 20(a) of

23   the Exchange Act because they had the power and ability to control and prevent

24   the   dissemination   of   the   foregoing   false   and   misleading   statements.

25   Notwithstanding, these defendants allowed the false and misleading statements to

26   be disseminated into the market, which had the effect of artificially inflating the

27   value of the Company's stock.   These defendants' failure to exercise proper control

28   over the Company's public disclosures further caused the Company to repurchase

nearly $8.6 billion of its own stock at inflated prices.  In particular, defendants Andreeseen, Baldauf, Gupta, Reiner, Russo, and Whitman, as members of the Technology Committee, were directly responsible for knowing the status of the Company's technology strategies, including its strategy concerning webOS.  These defendants, therefore, knew that the acquisition of Palm did not go well and that the Company was planning on shuttering webOS, including its highly built up TouchPad.    In addition, defendants Baldauf, Banerji, Gupta, Senequier, and Thompson served on the Company's Audit Committee, and therefore, had a responsibility and obligation to review and discuss HP's public filings with the U.S. Securities and Exchange Commission ("SEC"), including the misleading statements described herein.    Accordingly, Apotheker, Andreesssen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Senequier, Thompson, and Whitman face a substantial likelihood of liability for violations of federal securities law, demand upon them is futile.

71.    Defendants Apotheker, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Senequier, Thompson, and Whitman face a substantial likelihood of liability for wasting billions of dollars of the Company's assets.  Each of these defendants authorized and failed to halt HP's massive $8.6 billion repurchase of its own stock.  At the same time that Apotheker, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Senequier, Thompson, and Whitman authorized and refused to halt the repurchase, they knew the non-public inside information concerning the Company's decision to close down its webOS business, the very business that these same defendants were touting as being a major growth drive for the Company, including the "prime time" ready TouchPad.  No reasonable person would have paid the price that these defendants caused the Company to pay for HP stock if they knew the non-public information they knew.    According, Apotheker, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore,

Reiner, Russo, Senequier, Thompson, and Whitman are liable for the amount that the Company wasted and therefore, demand as to defendants Apotheker, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Senequier, Thompson, and Whitman is futile.

72.    Defendants Apotheker, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Senequier, Thompson, and Whitman also face a substantial likelihood of liability for making and allowing the other Individual Defendants to continue to make improper statements about the Company's health.  Each of these defendants knew, or in reckless disregard for their fiduciary duties, knew the truth about the Company's business health, in particular, the inability for the Company to successfully implement webOS from the Palm acquisition into a viable product line, and instead that the Company planned to discontinue this line of business.  Nevertheless, Apotheker, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Senequier, Thompson, and Whitman either participated in or allowed the improper statements to continue.

73.    The Board is not independent of defendant Apotheker.  The Board selected Apotheker to replace Mark V. Hurd as the CEO of HP.  The Board received widespread ridicule for its handling of Hurd's resignation.  Indeed, the Board members' reputation is now inextricably linked with Apotheker succeeding as CEO.  The most salient example of the Board's refusal to control Apotheker is when he personally chose five of the Company's directors to serve on the Board, defendants Banerji, Reiner, Russo, Senequier, and Whitman, despite the Company allegedly hiring a professional search firm to assist the Nominating and Governance Committee.  In playing a direct role in selecting these five directors, Apotheker usurped the role of the Board's Nominating and Governance Committee in evaluating and considering potential Board members.  Nevertheless, the Board took no action to reprimand Apotheker or include the Nominating and Governance

Committee in the selection of new Board members.  Rather, defendants Lane and Apotheker personally called defendants Banerji, Reiner, Russo, Senequier, and Whitman and invited them to the Board.  Accordingly, the Board showed it will not disagree with Apotheker, who faces a substantial likelihood of liability for making the numerous false statements explained above, let alone vote in favor of initiating action against them.  Accordingly, a reasonable doubt is raised regarding whether the Board can independently consider a demand.

74.    In addition, another director that played an active role in selecting these new members of the Board, defendant Lane, has known defendant Apotheker since the 1990s when Lane hired Apotheker.  Lane has admitted to having a close relationship with Apotheker.  Indeed, in his short time at HP, Lane has used his influence with Apotheker to aggrandize his position as managing partner of Kleiner Perkins Caufield & Byers ("Kleiner Perkins"), a venture capital investment firm.   In February 2011, HP acquired Vertica Systems, a Kleiner Perkins investment.   Lane personally sponsored Kleiner Perkins investing in Vertica Systems.  Lane will not jeopardize his relationship with Apotheker, which allows his company, and him, as a managing partner, significant investment potential through HP.

75.    Further defendant Andreessen is a director at Stanford Hospital and Clinics.  During the 2010 fiscal year, HP contributed over $7.5 million to Stanford Hospital and Clinics.  Defendant Apotheker, as CEO of the Company, controls its donations.   To vote in favor of initiating litigation against Apotheker would jeopardize any future contributions to Stanford Hospital and Clinics, something Andreessen will not do.   Accordingly, Andreessen is also not independent of Apotheker, rending a demand upon him futile.

76.    Moreover, the acts complained of constitute violations of the fiduciary duties owed by HP's officers and directors and these acts are incapable of ratification.

77.    Each of the defendant directors of HP authorized and/or permitted the improper statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the improper statements and are principal beneficiaries of the wrongdoing alleged herein and thus, could not fairly and fully prosecute such a suit even if such suit was instituted by them.

78.    HP has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for HP any part of the damages HP suffered and will suffer thereby.

79.    If HP's current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Complaint by directors and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of HP.  However, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by HP against these defendants, known as the "insured versus insured exclusion."  As a result, if these directors were to cause HP to sue themselves or certain of the officers of HP, there would be no directors and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no directors and officers' liability insurance, then the current directors will not cause HP to sue the defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

80.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for HP for any of the wrongdoing alleged by plaintiff herein.

81.     Plaintiff has not made any demand on the other shareholders of HP to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     HP is a publicly held company with nearly 2 billion shares outstanding and thousands of shareholders;

(b)     making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)     making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

**Against Defendants Apotheker and Lesjak for Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder**

82.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

83.     Defendants Apotheker and Lesjak knowingly or with extreme recklessness made and caused the publication of misleading statements regarding the financial health of the Company and its business prospects in connection with its webOS platform.

84.     Defendants Apotheker, Livermore, Lane, Babbio, Hammergren, Baldauf, Thompson, Gupta, Andreessen, Banerji, Reiner, Russo, Senequier, and Whitman caused HP to repurchase 221,340,000 shares of its own stock at a cost to

the Company of approximately $8.6 billion at artificially inflated prices caused by the false and misleading statements.

85.   The wrongful conduct alleged herein was continuous, connected, and on-going.   These defendants' misconduct resulted in continuous, connected, and on-going harm to the Company.

86.   Defendants Apotheker and Lesjak violated section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they:

        a)   employed devices, schemes, and artifices to defraud;

        b)   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        c)   engaged in acts, practices, and a course of business that operated as a fraud or deceit upon HP stock.

87.   HP has suffered damages by repurchasing the Company's stock at prices these defendants, knew were artificially inflated as a result of the false and misleading statements.   But for these defendants' misconduct, the Company would not have purchased its stock at the prices it paid, or at all, if it had been aware that the market prices had been artificially and falsely inflated by the misleading statements.

## COUNT II

### Against the Director Defendants for Violation of Section 20(a) of the Exchange Act

88.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

89.   The wrongful conduct alleged herein was continuous, connected, and on-going during the relevant period from the first improper statement on February 22, 2011, to August 18, 2011, when the truth was revealed. Defendants Apotheker, Livermore, Lane, Babbio, Hammergren, Baldauf, Thompson, Gupta, Andreessen,

1   Banerji, Reiner, Russo, Senequier, and Whitman's misconduct resulted in

2   continuous, connected, and on-going harm to the Company.

3        90.   Defendants Apotheker, Livermore, Lane, Babbio, Hammergren,

4   Baldauf, Thompson, Gupta, Andreessen, Banerji, Reiner, Russo, Senequier, and

5   Whitman, had the power and/or ability to, and did, directly or indirectly control or

6   influence the Company's general affairs, including the content of public statements

7   disseminated by HP and the timing and amount of stock repurchases, and had the

8   power and/or ability directly or indirectly to control or influence one another, and

9   defendants Apotheker and Lesjak in connection with the specific conduct that

10   violated section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated

11   thereunder as alleged above.

12        91.   Each of these defendants is jointly and severally liable under section

13   20(a) of the Exchange Act to the same extent as defendants Apotheker, Lesjak,

14   Livermore, Lane, Babbio, Hammergren, Baldauf, Thompson, Gupta,

15   Andreessen, Banerji, Reiner, Russo, Senequier, and Whitman for the primary

16   violations of section 10(b) and Rule 10b-5 promulgated thereunder, as set forth

17   herein. Defendants Apotheker, Livermore, Lane, Babbio, Hammergren, Baldauf,

18   Thompson, Gupta, Andreessen, Banerji, Reiner, Russo, Senequier, and Whitman

19   did not act in good faith.

20   **COUNT III**

21   **For Breach of Fiduciary Duty Against the Individual Defendants**

22        92.   Plaintiff incorporates by reference and realleges each and every

23   allegation contained above, as though fully set forth herein.

24        93.   As alleged in detail herein, the Individual Defendants by reason of

25   their positions as officers and directors of HP and because of their ability to control

26   the business and corporate affairs of HP, owed the Company fiduciary obligations

27   of due care and loyalty, and were and are required to use their utmost ability to

28   control and manage HP in a fair, just, honest, and equitable manner.

94.     Defendants Apotheker and Lesjak violated their duty of care by making improper statements in the Company's press releases, conference calls, and other public disclosures.   Apotheker and Lesjak knew, were reckless, or were grossly negligent in not knowing and making improper statements that concealed: (i) the fact that HP's business model was not working and the Company could not leverage its extensive portfolio and scale of products and services in a strategically beneficial manner; (ii) the webOS platform, including the TouchPad and webOS phones, and the Company's PSG segment was not central to HP's business model, and webOS would not be integrated across the Company's entire product line; (iii) that the inefficacy of TouchPad hardware rendered the webOS operating system ineffective and unprofitable, as the webOS system operated twice as fast on Apple's iPad 2 tablet compared to the TouchPad; and (iv) in light of the above, they had no reasonable basis to make positive statements about HP's financial results and business prospects.   Accordingly, Apotheker and Lesjak breached their duties of care, good faith, and loyalty.

95.     The Director Defendants owed HP the highest duty of loyalty.   These defendants breached their duty of loyalty by authorizing the additional $10 billion to the Company's repurchase program and allowing the Company to execute a repurchase of approximately $8.6 billion of the Company's stock at prices they knew, or in reckless disregard of their duties did not know, were artificially inflated.   Accordingly, the Director Defendants breached their duty of good faith and loyalty.

96.     The Audit Committee Defendants breached their fiduciary duty of loyalty by knowingly or recklessly allowing the Company to make improper statements in its public filings,   press releases, and earnings conference calls concerning the Company's financial health, business prospects, and forward guidance.   Additionally, this constituted a violation of the duties of the members of the Audit Committee under its Charter.

97.   As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

98.   Plaintiff, on behalf of HP, has no adequate remedy at law.

## COUNT IV

**Against the Individual Defendants for Waste of Corporate Assets**

99.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

100.   The Director Defendants wasted HP's corporate assets by authorizing and effectuating the repurchase of approximately $8.6 million of the Company's stock at prices they knew, or recklessly were unaware, were artificially inflated.

101.   The Individual Defendants also wasted corporate assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty, exposing it to civil liability, and causing it to incur potentially millions of dollars in legal costs.

102.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

103.   Plaintiff, on behalf of HP, has no adequate remedy at law.

## COUNT V

**Against the Individual Defendants for Unjust Enrichment**

104.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

105.   At the time of the Company's misstatements and all relevant times stated herein, the Individual Defendants received bonuses, stock options, stock appreciation rights, and/or similar such compensation from HP in breach of their fiduciary duties.  The Individual Defendants were unjustly enriched thereby.

106.   To remedy the Individual Defendants' unjust enrichment, this Court should order them to disgorge all proceeds the Individual Defendants received from their bonuses, stock options, and insider selling.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of HP, demands judgment as follows:

A.   Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.   Directing HP to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect HP and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

1.   a proposal to strengthen the Company's oversight and controls over its stock repurchase program;

2.   a proposal to strengthen the Company's controls over public disclosures;

3.   a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

4.   a provision to permit the shareholders of HP to nominate at least three candidates for election to the Board;

C.   Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds

- 43 -

1 of defendants' trading activities or their other assets so as to assure that plaintiff on

2 behalf of HP has an effective remedy;

3      D.    Awarding to HP restitution from defendants, and each of them, and

4 ordering disgorgement of all profits, benefits, and other compensation obtained by

5 the defendants,

6      E.    Awarding to plaintiff the costs and disbursements of the action,

7 including reasonable attorneys' fees, accountants' and experts' fees, costs, and

8 expenses; and

9      F.    Granting such other and further relief as the Court deems just and

10 proper.

## JURY DEMAND

12     Plaintiff demands a trial by jury.

13 Dated: September 21, 2011

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
FELIPE J. ARROYO
SHANE P. SANDERS
KEVIN S. KIM

BRIAN J. ROBBINS

600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsumeda.com
farroyo@robbinsumeda.com
ssanders@robbinsumeda.com
kkim@robbinsumeda.com

Attorneys for Plaintiff

652533

## VERIFICATION

I, Ernesto Espinoza, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Shareholder Derivative Company for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 9-19-2011

ERNESTO ESPINOZA

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge James V. Selna and the assigned discovery Magistrate Judge is Arthur Nakazato.

The case number on all documents filed with the Court should read as follows:

### SACV11- 1454 JVS (ANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=========================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [X] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)          NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

AO 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| ERNESTO ESPINOZA, Derivatively on Behalf of HEWLETT-PACKARD COMPANY | ) ) ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  **SACV11-01454 JVS (ANx)** |
| LÉO APOTHEKER, ANN M. LIVERMORE, CATHERINE A. LESJAK (see Attachment A) | ) ) ) | |
| *Defendant* | ) | |

### SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  Brian J. Robbins
ROBBINS UMEDA LLP
600 B Street, Suite 1900
San Diego, CA 92101

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

Date:  **SEP 2 1 2011**                    ROLLS ROYCE PASCHAL

*Signature of Clerk or Deputy Clerk*

ATTACHMENT A

RAYMOND J. LANE, LAWRENCE T. BABBIO, JR.,
JOHN H. HAMMERGREN, SARI M. BALDAUF,
G. KENNEDY THOMPSON, RAJIV L. GUPTA,
MARC L. ANDREESSEN, SHUMEET BANERJI,
GARY M. REINER, PATRICIA F. RUSSO,
DOMINIQUE SENEQUIER, and MARGARET C. WHITMAN,

                    Defendants,

    -and-

HEWLET-PACKARD COMPANY, a Delaware corporation,

           Nominal Defendant.

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❐ I returned the summons unexecuted because _____ ; or

❐ Other *(specify):*

              .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
ERNESTO ESPINOZA, Derivatively on Behalf of HEWLETT-PACKARD COMPANY

**DEFENDANTS**
LEO APOTHEKER, ANN M. LIVERMORE, CATHERINE A LESJAK, RAYMOND J LANE, LAWRENCE T. BABBIO, JR., JOHN H HAMMERGREN, SARI M BALDAUF, G. KENNEDY THOMPSON, et al

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Brian J. Robbins
ROBBINS UMEDA LLP
600 B Street, Suite 1900, San Diego, CA 92101; (619) 525-3990

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff    ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant    ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify):
☐ 6 Multi-District Litigation
☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☑ No          ☐ MONEY DEMANDED IN COMPLAINT: $_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C section 1331, Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | **REAL PROPERTY** | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | **IMMIGRATION** | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | | **FEDERAL TAX SUITS** |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 245 Tort Product Liability | ☐ 463 Habeas Corpus- Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 290 All Other Real Property | ☐ 290 All Other Real Property | ☐ 465 Other Immigration Actions | | ☐ 871 IRS-Third Party 26 USC 7609 |

**FOR OFFICE USE ONLY:**    Case Number: _____

### SACV11-01454 JVS (ANx)

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No ☑ Yes
If yes, list case number(s): Case No. 8:11-cv-01404-AG-RNB, Judge Andrew J. Guilford

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)
☑ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☑ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Hewlett-Packard Company - Orange | Andreessen, Apotheker, Lane, Lesjak, Livermore, Whitman - San Mateo; Hammergren - Contra Costa; Babbio - NY; Russo - FL; Gupta - PA; Reiner - CT; Thompson - NC; Senequier - France; Banerji - London; Baldauf - Finland |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _____ Date September 21, 2011

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |