1  ROBBINS UMEDA LLP
   BRIAN J. ROBBINS (190264)
2  brobbins@robbinsumeda.com
   FELIPE J. ARROYO (163803)
3  farroyo@robbinsumeda.com
   SHANE P. SANDERS (237146)
4  ssanders@robbinsumeda.com
   KEVIN S. KIM (275200)
5  kkim@robbinsumeda.com
   600 B Street, Suite 1900
6  San Diego, CA 92101
   Telephone: (619) 525-3990
7  Facsimile: (619) 525-3991

8  Attorneys for Plaintiffs

9  [Additional counsel on signature page]

10              UNITED STATES DISTRICT COURT

11           CENTRAL DISTRICT OF CALIFORNIA

12                   SOUTHERN DIVISION

13

14  IN RE HEWLETT-PACKARD        )   Master File No. 8:11-cv-01454-AG
    COMPANY SHAREHOLDER          )   (RNBx)
    DERIVATIVE LITIGATION        )
15                               )
    This Document Relates to:    )   CONSOLIDATED VERIFIED
16       ALL ACTIONS             )   SHAREHOLDER DERIVATIVE
                                 )   COMPLAINT
17                               )
                                 )
18                               )
                                 )   DEMAND FOR JURY TRIAL
19  _____ )

20

21

22

23

24

25

26

27

28

## NATURE AND SUMMARY OF THE ACTION

1. This is a verified shareholder derivative action brought by plaintiffs on behalf of nominal defendant Hewlett-Packard Company ("HP" or the "Company") against certain of HP's current and former officers and directors for breach of fiduciary duties, unjust enrichment, waste of corporate assets, and violations of securities laws. These officers and directors breached their duties of loyalty and due care as fiduciaries of HP, causing massive financial harm to HP and its shareholders.

2. HP is a provider of information technology and computer-related products, technologies, software, solutions, and services to individual consumers, small and medium-sized businesses, and large enterprises.

3. For much of its existence, HP has been best known for selling personal computers ("PCs") and printers.  However, while HP has been an acknowledged leader in selling computer and printer hardware, the Company had no ownership interest in any proprietary software.  HP's PCs and printers operated on Microsoft Corp. ("Microsoft") Windows operating system and related software applications.

4. Starting in the mid-2000s, as HP continued to build and sell hardware running on Microsoft's operating system, the market for smartphones and tablet PCs exploded.  New entrants such as Google Inc. ("Google"), Apple Inc. ("Apple"), and Research In Motion Ltd. (the maker of BlackBerry®) began developing their own operating systems for these mobile devices.  HP, however, missed the initial surge in development and sale of these mobile devices and operating systems.

5. Seeking to enter this emerging field via an acquisition, the Company announced a $1.2 billion deal to purchase Palm, Inc. ("Palm") in July 2010.  Palm, the developer of PalmPilot, one of the first hand-held computing devices, was a pioneer in the mobile devices market, but it had been overtaken by new

competitors.  HP saw Palm as an intriguing strategic acquisition because of Palm's ownership of its own operating system, webOS, which HP secured for itself as a unique proprietary asset.

6.     During the period from approximately July 2010 to August 2011 (the "Relevant Period"), defendants touted the tremendous business opportunities arising from the Company's control of its own, differentiated operating system and portrayed the Palm acquisition as a game-changing event because of webOS.  HP executives told investors that the Company planned to "double down on webOS" as the way HP would enter the smartphone and tablet markets.

7.     Shortly after acquiring Palm and webOS, HP accepted the resignation of former Chief Executive Officer ("CEO") and President V. Mark Hurd ("Hurd") on August 6, 2010.  Although Hurd had overseen a turnaround at HP and a doubling of its share price, the Company's Board of Directors (the "Board") requested Hurd's resignation after a former contractor accused him of sexual harassment.  Rather than fire him for cause, the Board paid him a severance package in the tens of millions of dollars.

8.     Under increasing pressure from investors and analysts to remedy the situation and show that a transition in leadership would not affect the success of the so-called "game-changing" Palm acquisition, the Board hurriedly hired defendant Léo Apotheker ("Apotheker") without ever meeting or interviewing him, and despite the fact that he had just recently been fired as CEO of SAP AG ("SAP") after only ten months and had little experience with the Company's main lines of business.  As one director later acknowledged, "I admit it was highly unusual [to not meet Apotheker], but we were just too exhausted from all the infighting" on the Board.

9.     Attempting to repair its image and credibility after the Hurd fiasco, the Board tethered the Company's success to the success of defendant Apotheker and webOS.  To that end, Apotheker and the other defendants issued numerous

statements throughout the Relevant Period describing the "unbelievably attractive and stunning technology" of webOS and explaining that "[w]e will put the same technology on our printers.  We will put them on PCs.  We will put them on touch pads.  We will put them on smartphones so you will see this become a very massive, very broad platform."

10.     Indeed, on June 2, 2011, the same day that defendant Apotheker stated that HP "can create the kind of a platform of about 100 million, 110 million devices a year," Apotheker infamously stated that "webOS is ready for prime time."

11.     In a further attempt to signal to investors that its plan was working and that webOS would be a "game-changing" event, the Board facilitated the Company's repurchase of approximately $8.6 billion worth of HP stock at artificially inflated prices during the Relevant Period.

12.     Unbeknownst to the public, however, defendants knew that webOS was not "ready for prime time" and, in fact might never be ready.  WebOS was not operating properly on HP's smartphones or tablet (the TouchPad), and defendants did not even discuss the possibility of extending webOS to PCs or printers until May 2011.  Moreover, defendants knew that the TouchPad was riddled with webOS software problems, as evidenced by the fact that the Company readied a software update to fix "hundreds" of problems on the TouchPad the very day it was released.  In fact, at the same time defendant Apotheker was publicly assuring investors that the TouchPad and smartphones were just the beginning of "wave after wave" of webOS devices, he decreed internally that he would "shut down" the entire webOS program if it was not "working out by the end of the year."

13.     The collapse of webOS would come sooner than anyone but the defendants expected.  On August 18, 2011, a mere forty-nine days after defendant Apotheker claimed that webOS was "ready for prime time," the defendants abruptly reversed course and announced that HP was shutting down all of its

webOS hardware operations.  Investors were shocked.  Shares of HP's stock fell 6% on August 18, 2011, and the stock plunged an additional 20% on August 19. This two-day stock drop wiped out more than $16 billion in shareholder value.

14.    Defendants' haphazard hiring of defendant Apotheker would prove disastrous beyond the failed launch of HP's TouchPad and its accompanying webOS projects.   In addition to shuttering its webOS business, defendant Apotheker shocked investors by announcing that the Company planned to sell or spin-off its market-leading PC division, further eroding the Company's market capitalization.  As defendant Catherine A. Lesjak ("Lesjak"), HP's Chief Financial Officer ("CFO"), acknowledged, severing the PC business would have required a one-time expense of $1.5 billion - a drastic departure from the $300 million to $400 million cost previously estimated by the Company.  Moreover, the Company later estimated that other spin-off costs, such as reduced purchasing power and elimination of joint branding opportunities, would have cost HP approximately $1 million annually.  Further undermining investor confidence, defendant Apotheker announced that the Company would acquire Autonomy Corp. plc ("Autonomy"), a British software company, for a whopping $10.3 billion – a price analysts unanimously agreed immensely overvalued the software company.   During Apotheker's tumultuous eleven month tenure at HP, the Company was forced to reduce its sales forecasts three times.

15.    On September 22, 2011, the Board terminated defendant Apotheker and hired defendant Margaret C. Whitman ("Whitman") as its third CEO in just over two years.  For his eleven months of service, Apotheker received a severance package valued at an estimated $35 million, rivaling the severance package afforded his predecessor's estimated $35-$40 million package.

16.    In October 2011, approximately two months after defendant Apotheker announced his plans to spin-off the PC division, the Company announced that it was scrapping its plan to spin-off the division.   Then, in

December 2011, after writing off more than $3 billion in webOS wind-down costs, HP cut its losses and dumped its entire $1.2 billion investment in Palm, contributing webOS to the public as "open-source" software for anyone to use and develop.

17.     As described herein, defendants abdicated their fiduciary duties owed to HP and its shareholders by: (i) making or causing the Company to issue improper statements concerning the viability and efficacy of HP's webOS software and the Company's plans to integrate webOS across its other business segments and devices, without any reasonable basis to do so; (ii) abandoning their responsibility to   adequately inform themselves of defendant Apotheker's qualifications and ability to lead the Company prior to hiring him to serve as HP's CEO; and (iii) causing the Company to repurchase its own stock at prices defendants knew (or recklessly failed to know) were inflated.   In addition, defendants Babbio, Lesjak, and Livermore exploited their knowledge of material, non-public information by selling over $44 million worth of their Company stock during the Relevant Period.

18.     Defendants Apotheker, Lesjak, and Bradley also violated section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") by making false and misleading statements concerning the Company's financial health and business prospects in connection with its webOS platform and directing the repurchase of approximately $8.6 billion of the Company's stock at prices they knew were inflated.   The Director Defendants (as defined herein), who exercised actual power and control of the actions of Apotheker, Lesjak, and Bradley are jointly and severally liable under section 20(a) of the Exchange Act for the false and misleading statements and the Company's repurchase of stock at inflated prices.

19.     Before the misconduct raised by plaintiffs, HP was a market leader and one of the most respected companies in the American high-tech industry.

However, defendants' action (and inaction) has devastated HP's market value and tarnished its reputation.  As a result of defendants' wrongdoing, HP lost over $57 billion in market capitalization (or 54% of its market value) during the Relevant Period from November 2010 to August 2011.  Defendants' misconduct has also caused credit rating agencies to downgrade HP's credit rating, thereby imposing additional costs on the Company to generate capital for its operations.  Finally, the Company has also suffered irreparable harm to its goodwill and reputation.

20.     Plaintiffs bring this derivative action to: (i) recover damages against the Individual Defendants (as defined herein) for the benefit of the Company; and (ii) require the Company to reform and improve its corporate governance and internal procedures to better protect the Company and its shareholders from a repeat of the damaging events described herein.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction in this case under Article III of the United States Constitution and 28 U.S.C. §1331 because it includes claims arising under the Exchange Act.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     This Court retains general jurisdiction over each named defendant who is a resident of California.  Additionally, this Court has specific jurisdiction over each named non-resident defendant because these defendants maintain sufficient minimum contacts with California to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  HP maintains operations in California.  Moreover, defendants' conduct was purposefully directed at California and arose in California, where HP maintains its

corporate headquarters.   Exercising jurisdiction over the named non-resident defendants is reasonable.

23.     Venue is proper in this Court pursuant to 28 U.S.C.§ 1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to HP occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiffs**

24.     Plaintiff Ernesto Espinoza was a shareholder of HP at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current HP shareholder.

25.     Plaintiff Larry Salat was a shareholder of HP at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current HP shareholder.

**Nominal Defendant**

26.     Nominal Defendant HP is a Delaware corporation with principal executive offices located at 3000 Hanover Street, Palo Alto, California.  HP is a leading global provider of products, technologies, software, solutions, and services to individual consumers, small- and medium-size businesses, and large enterprises, including customers in the government, health, and education sectors.  HP has six business segments including Services, Enterprise Servers, Storage, and Networking, HP Software, the Printing and Personal Systems Group, HP Financial Services, and Corporate Investments.  HP completed its acquisition of Palm, a

provider of smartphones powered by the Palm webOS mobile operating system, in July 2010.

**Defendants**

27.    Defendant Apotheker was HP's CEO, President, and a director from November 2010 until his termination on September 22, 2011.  Apotheker is also named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.

28.    Defendant Ann M. Livermore ("Livermore") is an HP director and has been since June 2011.  Livermore is also a member of HP's Technology Committee and has been since at least February 2012.  Livermore was Executive Vice President, HP Enterprise Services Business from May 2011 to August 2011 and Executive Vice President, HP Enterprise Business from May 2004 to June 2011. Livermore has served at HP in a variety of leadership positions in marketing, sales, research and development, and business management since joining the Company in 1982.

29.    Defendant Lesjak is HP's Executive Vice President and CFO and has been since January 2007.  Lesjak was also HP's Interim CEO from August 2010 to November 2010; Senior Vice President from 2003 to December 2006; and Treasurer from 2003 to March 2007.  Lesjak has served at HP for twenty-four years in a broad range of financial leadership roles.  Lesjak is named as a defendant in a securities class action complaint that alleges she violated sections 10(b) and 20(a) of the Exchange Act.

30.    Defendant R. Todd Bradley ("Bradley") is HP's Executive Vice President of the Printing and Personal Systems Group and has been since March 2012.  Bradley was also HP's Executive Vice President of the Personal Systems Group from June 2005 to March 2012.

31.     Defendant Marc L. Andreessen ("Andreessen") is an HP director and has been since 2009.  Andreessen is also Chairman of HP's Technology Committee and has been since at least January 2010.

32.     Defendant Lawrence T. Babbio, Jr. ("Babbio") is an HP director and has been since 2002.

33.     Defendant Sari M. Baldauf ("Baldauf") is an HP director and has been since 2006.  Baldauf is also a member of HP's Audit Committee and has been since at least January 2010.  Baldauf was a member of HP's Technology Committee from at least January 2010 to at least February 2011.

34.     Defendant Shumeet Banerji ("Banerji") is an HP director and has been since January 2011.  Banerji is also a member of HP's Audit Committee and has been since February 2011.

35.     Defendant Rajiv L. Gupta ("Gupta") is HP's Lead Independent Director and has been since November 2011 and a director and has been since 2009.  Gupta is also a member of HP's Audit Committee and has been since at least April 2012.  Gupta was a member of HP's Audit Committee from at least September 2011 to January 2012 and a member of the Technology Committee from at least January 2010 to at least February 2011.

36.     Defendant John H. Hammergren ("Hammergren") is an HP director and has been since 2005.

37.     Defendant Raymond J. Lane ("Lane") is HP's Executive Chairman of the Board and has been since September 2011.  Lane was also HP's non-Executive Chairman of the Board from November 2010 to September 2011.

38.     Defendant Gary M. Reiner ("Reiner") is an HP director and has been since January 2011.  Reiner is also a member of HP's Audit Committee and has been since at least April 2012 and a member of the Technology Committee and has been since March 2011.

39.     Defendant Patricia F. Russo ("Russo") is an HP director and has been since January 2011.  Russo is also a member of HP's Technology Committee and has been since March 2011.

40.     Defendant Dominique Senequier ("Senequier") is an HP director and has been since January 2011.  Senequier is also a member of HP's Audit Committee and has been since February 2011.

41.     Defendant G. Kennedy Thompson ("Thompson") is an HP director and has been since 2006.  Thompson is also Chairman of HP's Audit Committee and has been since at least September 2011 and a member of that committee and has been since at least January 2010.

42.     Defendant Whitman is an HP director and has been since January 2011.  Whitman has served as HP's President and Chief Executive Officer since September 2011. Whitman is also a member of HP's Technology Committee and has been since March 2011.

43.     Defendants Apotheker, Livermore, Lesjak, Bradley, and Whitman are sometimes referred to collectively herein as the "Officer Defendants."

44.     Defendants Baldauf, Banerji, Gupta, Senequier, and Thompson are sometimes referred to collectively herein as the "Audit Committee Defendants."

45.     Defendants Andreessen, Baldauf, Gupta, Reiner, Russo, and Whitman are sometimes referred to collectively herein as the "Technology Committee Defendants."

46.     Defendants Apotheker, Livermore, Whitman, Andreessen, Babbio Baldauf, Banerji, Gupta, Hammergren, Lane, Reiner, Russo, Senequier, Reiner and Thompson are sometimes referred to collectively herein as the "Director Defendants."

47.     Defendants Apotheker, Livermore, Lesjak, Whitman, Bradley, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Reiner, Russo,

Senequier, and Thompson are sometimes referred to collectively herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Defendants' Fiduciary Duties**

48.     By reason of their positions as officers, directors, and fiduciaries of HP, and because of their ability to control the business and corporate affairs of HP, the Individual Defendants at all times relevant to this action owed HP and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were at all times relevant to this action required to use their utmost ability to control and manage HP in a fair, just, honest, and equitable manner.   The Individual Defendants were required to act in furtherance of the best interests of HP and its shareholders so as to benefit all shareholders equally and not in furtherance of any individual personal interest or benefit.

49.     Each officer and director of the Company owed to HP and its shareholders the fiduciary duty to exercise good faith and due diligence in the administration of the affairs of the Company and in the use and preservation of its capital, property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

**Additional Duties of the Audit Committee Defendants**

50.   In addition to these duties, under its Charter in effect since 2010, Audit Committee Defendants Baldauf, Banerji, Gupta, Senequier, and Thompson owed specific duties to HP to review and approve the Company's earnings press releases, guidance, and quarterly and annual financial statements.   The Audit Committee's Charter provides in relevant part that the committee will:

> Meet to review and discuss with management and the independent registered public accounting firm HP's annual audited and quarterly financial statements, including HP's disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations."
>
> * * *
>
> Earnings Press Releases, Corporate Policies and Earnings Guidance. The Committee will review and discuss earnings press releases (paying particular attention to the use of "pro forma," or "adjusted" non-GAAP information), as well as corporate policies with respect to financial information and earnings guidance provided to analysts and ratings agencies.
>
> * * *
>
> Internal Controls. The Committee will review the adequacy and effectiveness of HP's internal controls, including any significant deficiencies in such controls and significant changes or material weaknesses in such controls reported by the independent registered public accounting firm, the internal auditors or management, any special audit steps adopted in light of material control deficiencies, and any fraud, whether or not material, that involves management or other HP employees who have a significant role in such controls.

**Additional Duties of the Technology Committee Defendants**

51.     In addition to the duties listed above, under the Charter in effect since 2010, Technology Committee Defendants Andreessen, Baldauf, Gupta, Reiner, Russo, and Whitman owed specific duties to HP to assess the Company's technology development strategies and the scope and quality of HP's intellectual property.  The Company describes the Technology Committee's duties as:

> The Technology Committee makes recommendations to the Board as to scope, direction, quality, investment levels and execution of HP's technology strategies; ***oversees the execution of technology strategies formulated by management***; ***provides guidance on technology as it may pertain to, among other things, market entry*** and exit, investments, mergers, acquisitions and divestitures, new business divisions and spin-offs, research and development investments, and key competitor and partnership strategies; and reviews and makes recommendations on proposed investment, acquisition, joint venture and divestiture transactions with a value of at least $200 million that involve technology prior to any review by other Board Committees or the Board pursuant to HP's M&A approval policies.

52.     Accordingly, the Technology Committee Defendants knew about, or consciously disregarded the lack of progress and shortcomings of the Company's purported plan to implement webOS software across its wide variety of products. Indeed, the Technology Committee Defendants were intimately involved in the Company's plan to leverage its webOS technology to break into the tablet and smartphone business since the Palm acquisition.  The crux of HP's business strategy during the Relevant Period was focused squarely on the success of its webOS platform, and the Technology Committee Defendants were tasked with overseeing and monitoring its developments.

**Access, Control, and Authority**

53.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of HP, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

54.    Because of their advisory, executive, managerial, and directorial positions with HP, each of the Individual Defendants had access to adverse material, non-public information about the financial condition, operations, and growth prospects of HP, including information regarding HP's decision to shut down the Company's webOS operations and future plans and the potential divestiture of its Personal Systems Group unit.

55.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of HP, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

56.    To discharge their duties, the officers and directors of HP were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of HP were required to, among other things:

(a)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health;

(b)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)    refrain from acting upon material, inside corporate information to benefit themselves;

(d)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(e)     remain informed as to how HP conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## THE FALSE AND MISLEADING STATEMENTS

57.     On July 1, 2010, HP completed its long-awaited acquisition of Palm, and, most importantly, secured control of Palms' webOS software that defendants touted would allow the Company to break into the mobile devices market. Defendants wasted little time promoting the crown jewel of the Company's $1.2 billion Palm acquisition – trumpeting the purportedly interminable opportunities to leverage its webOS platform.  In the press release issued the same day, defendant Bradley raved that "[w]ith webOS, HP will deliver its customers a unique and compelling experience across smartphones and other mobility products."

58.     Following the acquisition of Palm, defendants issued a series of materially false and misleading statements about the progress of webOS and HP's ability to effectively utilize the proprietary software on its smartphones and tablets. In particular, for three consecutive quarters, defendants made false and misleading statements that deceived the investing public as to HP's expected financial performance and the Company's strategic business plans concerning webOS.

59.     Defendants' public statements regarding webOS, HP's business strategy, and HP's financial prospects based on that strategy were each false,

misleading, and improper when made because they failed to disclose and misrepresented the following material adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)     HP's announced business model centered on webOS was a fabrication – the Company never had any concrete plan or operational strategy to leverage webOS across its "extensive portfolio" and scale of products and services in a strategically beneficial manner.  In fact, defendants had not even internally discussed their publicly-touted plan to integrate webOS across its other business segments such as PCs and printers, and no such plan had been seriously developed or tested in any meaningful way;

(b)     the TouchPad hardware was a poor match with webOS to begin with, limiting the degree of effectiveness of the webOS operating system.  The TouchPad was encumbered with significant reliability issues and bugs, including problems when booting-up the device, and usability in Wi-Fi networks.  The TouchPad also was laden with significant performance issues.  In fact, webOS operated twice as fast when loaded onto Apple's iPad 2 tablet as it did on HP's TouchPad. The development process of the TouchPad were marred by delays, missed benchmarks,` and deadlines, as HP's development team raced to launch the TouchPad in time to compete with Apple's iPad 2; and

(c)     based on the foregoing, defendants lacked a reasonable basis for their bullish positive statements about HP's new products, financial prospects, revenue growth rates, market share, diluted earnings per share ("EPS"), and the Company's ability to deliver upon its long-term growth model.

60.     The false and misleading statements set forth below were either made or tacitly approved by the Individual Defendants.  In particular, defendants Apotheker and Lesjak directed the issuance of these public disclosures and acquiesced to the truth and veracity of the statements contained therein by failing to take any corrective measures to remedy the misstatements.  Further, the Audit

Committee Defendants reviewed and authorized the dissemination of the Company's earnings releases and public statements concerning the Company's financial operations.  Accordingly, defendants Apotheker, Lesjak, Bradley, and the Audit Committee Defendants breached their fiduciary duties by making or permitting the false and misleading statements detailed below.

61.    On November 22, 2010, HP issued a press release announcing its fourth quarter and fiscal year 2010 financial results.  The Company reported net income of $2.5 billion, or $1.10 diluted EPS, and net revenue of $33.3 billion for the fourth fiscal quarter ended October 31, 2010.  Additionally, the Company reported fiscal year 2010 net revenue of $126 billion.  The Company provided guidance for its first quarter of fiscal 2011 of revenue in the range of $32.8 to $33 billion and diluted EPS in the range of $1.06 to $1.08 per share.  The Company further provided guidance for the full year fiscal 2011 of revenue in the range of $132 to $133.5 billion, and diluted EPS in the range of $4.42 to $4.52 per share. The release stated in part:

> "HP proved once again that it is able to execute given its market strengths and technology leadership," said Léo Apotheker, HP president and chief executive officer. "I have seen firsthand that we have talented people who are focused on delivering value for our customers. Our market opportunity is vast, and I am confident that we will extend our leadership into the future."

62.    After releasing its fourth quarter fiscal 2010 financial results on November 22, 2010, HP hosted an analyst conference call.  During the call, defendant Apotheker provided additional color on why he thought HP would "extend [its] leadership into the future."  In particular, he stated:

> HP has many strengths, and it's actually a formidable Company.  To name just a few of these strengths, I'd like to say the breadth of our technology    portfolio,    our    scale,    our    people,    our    customer

- 17 -

relationships, and our operational excellence.  I do believe that our greatest strength is actually our opportunities.  ***Given our size and breadth, we have a unique position in the market to expand, to do way more business in emerging markets, to become more of a solution provider for our customers, and to leverage our own technology better across the entire Company***.  And you should bear in mind, that our technology trends are morphing, and they are morphing rapidly.

We, at HP, have the opportunity to grow our leadership position. We're addressing the cloud in many ways, an example, converged infrastructure, and ***we are addressing mobility with webOS***.  So all of these are fantastic opportunities that we are looking at.

63.    Defendant Apotheker's statements during the earnings conference call were materially false and misleading when made. Apotheker had no reasonable basis for his assertions that the Company was in a "unique position in the market to expand, to do way more business in emerging markets, … and leverage [its] technology better across the entire Company," because he knew or recklessly disregarded the fact that the Company had yet to make any progress in developing its webOS platform, and had in fact, had only recently entered into the mobile device market.  In truth, HP did not have internal plans to put webOS on printers or PCs.  In fact, neither Apotheker nor any other defendant discussed internally a plan to integrate webOS to HP's PCs and printers, nor did any defendant discuss a timeline for when that might happen until May 2011 –three months before defendants abandoned the project altogether. Similarly, Apotheker's statement that the Company was "addressing mobility with webOS," was misleading and improper because as he knew or was reckless in not knowing that the Company was experiencing material setbacks with its mobile devices running the webOS

system, including, among other things, its TouchPad hardware which was incompatible with webOS – thereby limiting its effectiveness and usability.

64.     On January 7, 2011, defendant Bradley discussed HP's plans to launch its webOS platform in an interview with CNBC at the annual Computer Electronics Show.  Specifically, Bradley announced that HP would release its first tablet called the TouchPad, which would operate the webOS system that would purportedly rival Apple's iOS system and Google's Android system.  Bradley claimed that HP was "totally focused on the tablet market, totally focused on enabling that with webOS."  Bradley also disclosed HP's plans to expand its webOS system to other products, stating that "we think of [the webOS system] broadly as the tablet is one piece of that ecosystem, one piece of that connected experience that we're going to create."

65.     Defendant Bradley's statements during his interview with CNBC were materially false and misleading when made.  Contrary to his assertions that the TouchPad and webOS was "one piece of that ecosystem, one piece of that connected experience that we're going to create," Bradley knew or recklessly disregarded the fact that the Company had neither made progress in developing its webOS platform, and did not have concrete plans or commitment to integrate or create an "ecosystem" leveraged from the webOS system across its other product lines.  HP did not have internal plans to put webOS on printers or PCs.  Neither defendant Apotheker nor any other defendant discussed internally a plan to integrate webOS to HP's PCs and printers, nor did any defendant discuss a timeline for when that might happen, until May 2011 – three months before defendants abandoned the project altogether.

66.     On February 9, 2011, HP hosted a special event called "Think big, Think small, Think beyond: webOS Announcement," in which the Company unveiled its line of webOS products including the TouchPad and webOS-based smart phones.  Defendants continued to rave about the Company's plans to

leverage the webOS software across various other platforms.  Defendant Bradley disclosed HP's "commitment to extend the WebOS footprint even further as the year progresses, taking WebOS to other connected devices, including printers, some form factors you haven't seen before."  In addition, defendant Bradley announced that "later this year" HP "plan[ned] to bring WebOS to the HP device that has the biggest reach of all: the personal computer."

67.   Defendant Bradley's statements during his interview with CNBC were materially false and misleading when made. Contrary to his statements, defendant Bradley knew or recklessly disregarded that the Company had no concrete plan or commitment to integrate its webOS software to other devices.  In fact, in stark contrast to his statement that HP planned to bring webOS to PCs "later [in the] year", Bradley knew or recklessly disregarded the fact that the Company did not have webOS operating PCs or printers in development, and that the Company would not be able to introduce such products by the end of 2011.  In fact, neither defendant Apotheker nor any other defendant discussed internally a plan to integrate webOS to HP's PCs and printers, nor did any defendant discuss a timeline for when that might happen until May 2011.

68.   On February 22, 2011, HP issued a press release announcing its first fiscal quarter 2011 financial results.  The Company reported net earnings of $2.6 billion, or $1.17 diluted EPS, and net revenue of $32.3 billion for the first quarter ended January 31, 2011.  The Company provided guidance for its second quarter of fiscal 2011 of revenue in the range of $31.4 to $31.6 billion, and diluted EPS in the range of $0.99 to $1.01 per share.   The Company further provided revised guidance for fiscal 2011 of revenue in the range of $130 to $131.5 billion, and diluted EPS in the range of $4.46 to $4.54 per share.

69.   After releasing its first quarter fiscal 2011 financial results on February 22, 2011, HP hosted a conference call during which defendants represented the following:

[LESJAK:]  *[I]n terms of the guidance, there is no question that we are being prudent and we're remaining cautious about the environment for consumer PCs…. in the second half of the year, we'll also benefit from the launch of our new webOS family of products*.

\* \* \*

[APOTHEKER:]  Let me maybe add one comment to what Cathie has said.  *We have been looking very hard at our forecast and I can just confirm that we are very confident in our ability to deliver the updated fiscal year '11 outlook*….We see strength in our other businesses and we have scrubbed these numbers long and hard and we believe that these are the right numbers.

70.  Defendants Lesjak's and Apothekers' statements were false and misleading when made.  Lesjak's statement that the Company would "benefit from the launch of … new webOS family of products" was false and misleading because she knew or recklessly disregarded the fact the Company was experiencing serious setbacks in developing its webOS platforms, in particular, delays and software problems encountered in integrating webOS software with the TouchPad.  Apotheker's statement that he was "very confident in [the Company's] ability to deliver the updated fiscal year '11 outlook," was also false and misleading.  Apotheker had no reasonable basis to make such a bullish statement because he knew or recklessly disregarded the fact that the Company was experiencing material setbacks in developing the Company's webOS platform, and the Company's growth strategy was invariably tied to the success of its webOS products and integration efforts.

71.  On March 1, 2011, defendant Lesjak participated in a Morgan Stanley Technology, Media & Telecom Conference, during which she stated:

***I think it's important for you all to understand that we have a lot of confidence in our ability to deliver our outlook for fiscal 2011.***

\* \* \*

Our model's intact, we've got the operational discipline to continue to expand margins…we did take revenue down as you know $2 billion for the fiscal year…. ***Frankly if we didn't have confidence in that revenue, we would've taken revenue down further.*** The difference to you all of $2 billion or $2.5 billion is just not meaningful. So at the end of the day, ***we have the confidence in the revenue outlook we provided.***

72.   Defendant Lesjak had no reasonable basis to make such bullish statements regarding the Company's revenue outlook because she knew or recklessly disregarded the fact that the Company was experiencing material setbacks in developing the Company's webOS platform. She also knew that the Company's growth strategy was invariably tied to the success of its webOS products and integration efforts, and that the company was experiencing delays and software issues in the research and development of the TouchPad. Accordingly, defendant Lesjak had no basis in fact to express "confidence in the revenue outlook."

73.   On March 14, 2011, HP hosted a special summit (the "Summit") for industry analysts and media representatives. During this conference, defendant Apotheker declared that HP was "getting ready to roll out Web OS on a massive scale," and highlighted webOS and its advantages, stating:

1   So *webOS is an unbelievably attractive and stunning technology*.

2

3   * * *

4   So we will be shipping this, first of all, on the dedicated devices,

5   smartphones and the tablet.  The Touch, our tablet, will come out –

6   the Touch pad will come out in June *and from that day onwards*

7   *there will be wave after wave of technology coming out to support*

8   *the webOS platform*.

9

10   There will be a beta version for webOS running on a browser on PCs

11   available at the end of the year and you will see us putting webOS on

12   the (inaudible) technology on PCs, on Windows PCs I should add,

13   starting from that point onwards.  And *we hope to reach 100 million*

14   *devices a year*.

15

16   *We will put the same technology on our printers.  We will put them*

17   *on PCs.  We will put them on touch pads.  We will put them on*

18   *smartphones so you will see this to become a very massive, very*

19   *broad platform*.

20   74.   At the Summit, defendant Bradley presented the Company's webOS

21   "connectivity" strategy to "extend webOS to the broadest range of products

22   available."  Bradley reiterated his previous comments that the Company would be

23   "extending the ecosystem beyond smart phones and tablets," and that

24   "[d]evelopment teams across HP are working to bring [webOS] and the [webOS]

25   experience to Windows PCs."  He expressed confidence that by "[n]ext year, [the

26   Company would] migrate tens of millions of web connected printers into the

27   ecosystem."

28

- 23 -

75.     Defendants Apotheker and Bradley's statements at the Summit were false and misleading when made.  First, Apotheker's statements that there would be "wave after wave of technology coming out to support the webOS platform," that the Company sought to reach "100 million devices a year," and that the Company would put webOS software in printers and PCs creating a "massive, very broad platform," were false and misleading because he knew or recklessly disregarded the fact that the Company did not have webOS operating printers or PCs in development and that the Company was experiencing material setbacks in developing the Company's webOS platform. In truth, HP did not have internal plans to put webOS on printers or PCs.  In fact, neither Apotheker nor any other defendant discussed internally a plan to integrate webOS to HP's PCs and printers, nor did any defendant discuss a timeline for when that might happen, until May 2011 – three months before defendants abandoned the project altogether.  For example, at the same time that Apotheker made his March 14, 2011, announcement that "[t]here will be a beta version for webOS running on a browser on PCs available at the end of the year," no "alpha" version even existed, and Apotheker privately declared that, "[i]f this thing is not working out by the end of the year, I'm gonna shut it down."  In addition, Apotheker had no reasonable basis to make outlandish remarks projecting "wave after wave" of webOS technology and over "100 million" webOS operating devices because as he knew or recklessly disregarded, the Company did not have any concrete plan or commitment to integrate webOS across its other business segments, and was having significant performance issues with implementing the webOS software to operate on its TouchPad.

76.     Defendant Bradley's statements at the Summit were false and misleading for the same reasons.  Defendant Bradley knew of, or recklessly disregarded the Company's inaction in integrating webOS into its other business segments and the significant problems the Company was experiencing in

integrating webOS into its TouchPad.  Accordingly, defendant Bradley had no reasonable basis to perpetuate the façade that the Company would was fast - implementing its "connectivity" strategy, would "extend webOS to the broadest range of products available," and by "[n]ext year, [the Company would] migrate tens of millions of web connected printers into the ecosystem."  Indeed, defendant Bradley's statements that the Company would be "extending the ecosystem beyond smart phones and tablets," and that "[d]evelopment teams across HP are working to bring [webOS] and the [webOS] experience to Windows PCs" were blatantly false because, at the time, the Company did not have webOS operating PCs or printers in development.

77.    On May 17, 2011, HP issued a press release announcing its second fiscal quarter 2011 financial results.  The Company reported net earnings of $2.3 billion, or $1.05 diluted EPS, and net revenue of $31.6 billion for the second quarter ended April 30, 2011.  The Company provided guidance for its third quarter of fiscal 2011 of revenue in the range of $31.1 to $31.3 billion, and diluted EPS in the range of approximately $0.90 per share.  The Company further provided revised guidance for fiscal 2011 of revenue in the range of $129 to $130 billion, and diluted EPS in the range of at least $4.27 per share.  The release stated, in part:

> "HP executed well and delivered a solid quarter," said Léo Apotheker, HP president and chief executive officer.  "Our enterprise strategy, with services at its core, is focused on higher value-added solutions. Today we are accelerating our efforts to align our services business model to our long-term strategy to deliver unprecedented value to our customers and a better return for our shareholders."

78.    After releasing its second fiscal quarter 2011 financial results on May 17, 2011, HP hosted a conference call during which defendant Apotheker stated that HP continued to see growth in PCs and that PCs and Touch Pads were a "great opportunity for HP."

79.     Defendant Apothekers statements in the Company's earnings release and conference call were false and misleading when made. Defendant Apotheker had no reasonable basis to make such bullish statements regarding the Company's "long-term strategy," and knew that TouchPads were not a "great opportunity for HP." In particular, he knew or recklessly disregarded the fact that the Company was experiencing material setbacks in developing the Company's webOS platform. Hee also knew that the Company's growth strategy was invariably tied to the success of its webOS products and integration efforts, and that the Company was experiencing delays and software issues in the research and development of the TouchPad.

80.     Defendant Apotheker continued to make assurances in the weeks leading up to the release of the TouchPad to the market.  On June 1, 2011, Apotheker gave a sit-down interview about HP's webOS plans at the All Things Digital D9 conference in Los Angeles, California.  He reiterated that HP's goal was to "create as holistic an ecosystem as we can" for webOS and declared that, in addition to the TouchPad and webOS smartphones, HP would put webOS "on every PC that we'll ship" and "on every printer we ship above $100," so that the number of webOS-enabled devices would total "100 to 110 million devices a year."

81.     Defendant Apotheker's statements in his interview that HP's goal was to "create as holistic an ecosystem as we can" for webOS, and HP would put webOS "on every PC that we'll ship" and "on every printer we ship above $100," so that the number of webOS-enabled devices would total "100 to 110 million devices a year," were false and misleading when made.  He knew or recklessly disregarded the fact that the Company had made minimal progress in developing webOS operating printers or PCs, the Company did not have a concrete plan or commitment to create an "ecosystem" for webOS, and the Company continued to experience material setbacks in developing the Company's webOS platform.

Defendant Apotheker had no reasonable basis to make such outlandish remarks because as he knew or recklessly disregarded, the Company was having significant performance issues with implementing the webOS software to operate on its TouchPad.

82.    On June 2, 2011, defendant Apotheker participated at a Sanford C. Bernstein & Co. Strategic Decisions Conference.   During his speech, Apotheker again touted webOS as "ready for prime time."  In particular, he stated:

> *The other thing we are doing really well on the [Personal Systems Group] side of the house is webOS.  So webOS is ready for prime time.  It's now out on a small phone, the Veer. And it will be out on the format of the tablet by the end of June/early July.  And it will go into distribution then.  We are all about webOS.*  We are more than about this with the other form factor. ***And I am happy to reconfirm that webOS will be available on PCs, on top of Windows***, which creates a whole new market dynamic for…

[ANALYST:]      Do you have a date for that? webOS on the PC?

[APOTHEKER:]   2012.  I know there are 12 months in 2012, even in Germany.  ***And then we have – and we are going to put webOS also on printers.  So we can create the kind of a platform of about 100 million, 110 million devices a year***.   And by the way, we won't shy away from licensing webOS to others if that opportunity arises.

83.    Defendant Apotheker's statements were false and misleading when made.  Contrary to his assertions that webOS was "ready for primetime*,"* "that webOS will be available on PCs, on top of Windows," and that the Company would "put webOS also on printers" creating a " platform of about 100 million, 110

million devices a year," defendant Apotheker knew or recklessly disregarded the fact that the Company had made minimal progress in developing webOS operating printers or PCs, the Company did not have a concrete plan or commitment to create an "ecosystem" for webOS, and the Company continued to experience material setbacks in developing the Company's webOS platform.  Indeed, the Company was having significant performance issues with implementing the webOS software to operate on its TouchPad, and would abandon its webOS platform. altogether merely two months later.

84.     In an article published by *All Things Digital* five days after the launch of HP's Touchpad on July 6, 2011, defendant Bradley continued to tout the viability of the Company's webOS platform and the Company's plans to implement webOS software on HPs other products:

> In recent interviews HP executives have talked about the importance of webOS to the core of the company's business. HP is counting on webOS to power a range of devices, from future tablets to the Pre and other smartphones. ***HP is also looking to boost the operating system's presence by making it available on printers as well as from within its Windows PCs***.
>
> "We've got lots of capabilities that we have to bring to scale," HP Executive Vice President Todd Bradley told AllThingsD. "We've just got to do it."
>
> Bradley wouldn't commit to a schedule for when future devices would hit the market after the already announced Pre3, but he said ***the company is committed to a broad webOS lineup.***

85.     Defendant Bradley's statements were false and misleading when made.  Contrary to his assertions that the Company would make webOS "available on printers as well as from within its Windows PCs," and that the  was "ready for primetime," "that webOS will be available on PCs, on top of Windows," and that

"the company [wa]s committed to a broad webOS lineup," defendant Bradley knew or recklessly disregarded the fact that the Company had made minimal progress in developing webOS operating printers or PCs, the Company did not have a concrete plan or commitment to create an "ecosystem" for webOS, and the Company continued to experience material setbacks in developing the Company's webOS platform.

86.    On July 11, 2011, the Company issued a press release in which defendants insisted on the success of the webOS software and integrating it across its other products.   In particular, the press release trumpeted the purported "successful launch of HP webOS 3.0" and announced that the Company was "accelerating the global expansion of webOS."   The press release reiterated the Company's alleged "strategy to provide a seamless, secure, context-aware experience across HP's product portfolio."  Defendant Bradley was disclosed in the press release as follows:

> **With the successful debut of our first wave of webOS-based products**, we are drawing on our deep executive bench to position the right leaders in the right roles **to accelerate the long-term growth of webOS**… Stephen DeWitt has a proven ability to build and scale organizations into global, multibillion dollar operations, and I am confident that he will take webOS to the next level.

87.    Defendants statements in the July 11 press release were false and misleading when made.  Contrary to their assertions, that the Company's launch of its first webOS-based products were not successful.  In fact, as defendants knew or were recklessly unaware, the Touchpad was wrought with significant software issues. In fact, even before the TouchPad was released with its webOS 3.0 operating system, the Company already developed an update called webOS 3.0.2 to address performance and reliability issues with the operating system.   In addition, defendants statement that the Company was "accelerating the global

1   expansion of webOS," and defendant Bradley's insistence that the Company was

2   poised to "accelerate the long-term growth of webOS," were similarly false and

3   misleading as defendants knew or recklessly was unaware that the launch of the

4   TouchPad was a disaster, the Company had not made any progress in developing

5   webOS operating printers or PCs, and the Company did not have a concrete plan or

6   commitment to develop its webOS platform.

7   88.   Even as late as July 20, 2011, less than a month before the Company

8   would scrap its webOS platform altogether, defendant Bradley remained bullish

9   about the prospects of the Company's webOS software.   In an interview with

10  Bradley published by *Bloomberg* entitled "Bradley Says HP to Invest Aggressively

11  in TouchPad," Bradley continued to insist that the Company was primed to

12  introduce webOS across its numerous other business segments:

14  As we've launched the TouchPad, frankly, if you go back a year ago

15  to when we bought WebOS and Palm, ***what we looked at was the***

16  ***ability to create a family of connected devices, a family of products***

17  ***that have a common user interface, a common set of applications,***

18  ***frankly, have ubiquity across the usage model***. As we think about

19  connectivity, and connectivity's really what's driving a lot of our

20  business today. It's all about the safe, secure, ubiquitous access to

21  information that's important to you.

22  *   *   *

23  Well, first, HP's a very, very diverse technology company, the largest

24  in the world. ***So we have multiple pushes that center around some***

25  ***common strategies, a strategy around connectivity***. Clearly the cloud

26  is a critical piece of the enablement of you to connect to that

27  information that you've stored in the cloud, your personal cloud, your

28  corporate cloud. Our hardware businesses will provide those onramps

and off-ramps. Our hardware businesses will provide the infrastructure that will enable the cloud, so as we continue to look broadly at the cloud, continue to look at software across all of our businesses, our printing business, our server business, our PC business, *you'll see us look at things like WebOS that create that ecosystem that help us to build that ubiquitous set of products that we know is so important to both consumers and enterprises*.

\* \* \*

First, we've talked about, very publicly, *our intention to enable all of our PC users to access their WebOS environment, their applications on their PCs*, and we're the largest PC manufacturer in the world, and we know bringing that volume to our developers will further build out our ecosystem. You've heard us talk pretty broadly about a *willingness to expand the distribution of WebOS with partners who would expand our ecosystem*, who would bring in products that we may not necessarily produce, but we know would be important in that realm of connected devices.

\* \* \*

I think by definition, *the TouchPad is differentiated and has some very unique capabilities in the tablet market*. I think if we start with, let's agree with the very, very early stages of what should be *a huge market for Hewlett Packard* and for our industry overall.

89.    When queried as to rumors that the TouchPad was experiencing lagging sales, defendant Bradley summarily dismissed the notion and confirmed that HP would "continue to invest very aggressively" in its webOS products:

Well, look, I'm sure our competitors hope it's not selling well. ***I would tell you that we're very happy with the ramp, we'll continue to invest very aggressively***. You'll see a continual increase in the media weight behind advertising it, a continual focus on how we use our 180,000 partners around the world to take us into the enterprise, so they should be concerned about what we'll do competitively.

90.     Defendant Bradley's statements in the July 20 interview were false and misleading when made.  In particular, as defendant Bradley well knew or recklessly disregarded, the Company did not have in place an operative "connectivity" strategy for webOS, had no intent "to enable all of our PC users to access their WebOS environment, their applications on their PCs," and did not have internal plans to put webOS on printers or PCs.  In fact, the Company had not made progress in developing webOS operating printers or PCs, and the Company did not have a concrete plan or commitment to create an "ecosystem" to integrate webOS across its other business segments.  Further, defendant Bradley's denials concerning the poor sales of the Company's webOS-based mobile devices were misleading. In fact, the TouchPad was a failure and riddled with significant issues as demonstrated by the fact that the Company already had developed an update to the webOS operating system installed in the TouchPad to remedy performance and reliability problems.

### THE TRUTH BEGINS TO EMERGE

91.     In each of the above public statements, defendants misrepresented the true state of HP's progress with, plans for and commitment to, webOS. Investors, therefore, had no advance warning and no way to avoid the financial disaster defendants knew (or recklessly disregarded) would occur when the truth was revealed.

92.     Just forty-nine days after releasing the TouchPad to great fanfare and trumpeting HP's plans for webOS, defendant Apotheker announced that HP was withdrawing the TouchPad effective immediately, ceasing all support for the device and the webOS operating system, and killing its plan to build a webOS-based hardware business.  Investors were given the impression that HP had decided, apparently on impulse, to write off the $1.2 billion dollar investment they had been led to believe was the future of the Company.

93.     Making matters worse, HP announced at the same time that it was considering the sale of its Personal Systems Group segment the division of HP that makes personal computers (the "PC division") – HP's business line responsible for 30% of HP's annual revenues.

94.     In particular, on August 18, 2011, barely two months after defendant Apotheker declared his confidence in, support for, and purported massive plans to expand the Company's offerings based on webOS, HP issued a press release announcing that not it would miss its revenue estimates and guidance for a third time and revealed a shocking change of strategic direction for the Company – HP was discontinuing its support for the entire webOS system and all webOS products.

95.     In that press release, the Company reported net earnings of $1.9 billion, or $0.93 diluted EPS, and net revenue of $31.2 billion for the third quarter ended July 31, 2011.  The Company once again revised its revenue guidance downward for fiscal year 2011, this time to a range of $127.2 to $127.6 billion, versus previous guidance of $129 to $130 billion, and its diluted EPS guidance to a range of $3.59 to $3.70 per share, versus previous guidance of at least $4.27 per share.

96.     HP's August 18, 2011 press release announced not just one, but three massive shifts in HP's long-term business model.  First, HP was purchasing enterprise content management and search vendor Autonomy for $10.3 billion, agreeing to pay a 64% premium for the company over its prior-day closing price.

Second, HP announced that it was exploring strategic alternatives for its Personal Systems Group segment, including potentially selling or spinning off its profitable PC division.  Third, the Company announced that it "will discontinue operations for webOS devices, specifically the TouchPad and webOS phones."

97.     On a conference call that same day, defendant Lesjak advised that "for [Generally Accepted Accounting Principles ("GAAP")] guidance, we expect to take a GAAP-only cash charge of approximately $1 billion for restructuring and shutdown costs related to webOS devices."  Lesjak offered no other explanation for the guidance shift.

98.     More specifically, as reported in the Company's 2011 Form 10-K, HP's Corporate Investments segment, which included the webOS Global Business Unit, suffered an extraordinary $1.6 billion loss from operations due primarily to $755 million of expenses HP was obligated to pay suppliers following the webOS shutdown.  HP also recorded an $885 million charge for impairment of goodwill and purchased intangible assets, and a restricting charge of $33 million, specifically in connection with the webOS shutdown.

99.     On August 19, 2011, *CRN* published an article entitled "HP Partners Startled by TouchPad's Demise, Uncertain WebOS Future."  The article provided, in part:

> Chris Barnes, vice president of research and solutions development at
> Gap Intelligence, a San Diego-based research firm that follows HP,
> wonders if the HP brass really believed the WebOS talking points.
> "WebOS was such a linchpin of the company's overarching strategy; it
> was the virtual glue that tied together phones, PCs, tablets, printers,"
> Barnes said. "It really makes you wonder whether HP's senior
> leadership ever really believed its own story about developing its own
> self-supporting ecosystem, vis-a-vis Apple.  *[It] sounds more like*
> *they were dishing out the Kool-Aid but secretly drinking iced tea*."

100.   As news of HP's upheaval began to leak into the market on August 18, 2011, HP's stock declined $1.88 per share, to close at $29.51 per share, a one-day decline of nearly 6% on volume of over ninety-six million shares.  The next day, HP's stock collapsed as the market fully digested the news of the Company's dismal results and outlook and the massive changes in its strategic plans.  On August 19, 2011, HP's stock price plummeted to its lowest level in six years, trading as low as $22.75 per share before closing at $23.60.  This represented a decline of $5.91 per share, or 20%, on volume of 129 million shares.  This was the largest one-day decline in HP's value since the Black Monday stock market crash of October 1987.

101.  On November 21, 2011, HP announced that it wrote off approximately $3.3 billion in after-tax costs for fiscal year 2011 due to "the wind down of HP's webOS device business."

## THE FRAUDULENT REPURCHASES

102.  While the Individual Defendants were making misleading and improper statements that artificially inflated the Company's stock price, Defendants Apotheker, Lesjak, Livermore, Lane, Babbio, Hammergren, Baldauf, Thompson, Gupta, Andreessen, Banerji, Reiner, Russo, Senequier, and Whitman directed or permitted the Company to overpay for its own stock through the massive repurchases discussed herein.  As detailed below, Apotheker, Lesjak, Livermore, Lane, Babbio, Hammergren, Baldauf, Thompson, Gupta, Andreessen, Banerji, Reiner, Russo, Senequier, and Whitman facilitated and allowed the Company to buy-back its shares at inflated prices by authorizing a repurchase program that totaled $20 billion.  These Director Defendants knew or recklessly disregarded the fact that the Company's stock was artificially inflated due to the misleading statements alleged herein, and they failed to prevent the Company from repurchasing its stock at inflated prices.  Defendants Apotheker and Lesjak, as HP's top executives, were ultimately responsible for

the Company's repurchases – in particular, repurchases of the magnitude transacted during the relevant period (over $8 billion).  Despite knowing that the Company's stock was inflated due to their improper and misleading statements, Apotheker and Lesjak directed or permitted the repurchase of approximately $8.6 billion of the Company's stock.

103.  On August 29, 2010, defendants Babbio, Hammergren, Baldauf, Thompson, Gupta, and Andreessen authorized the Company to repurchase $10 billion of its own stock.   Then, on July 21, 2011, defendants Apotheker, Livermore, Lane, Babbio, Hammergren, Baldauf, Thompson, Gupta, Andreessen, Banerji, Reiner, Russo, Senequier, and Whitman inexplicably authorized an additional $10 billion to the Company's stock repurchase program, which still had $5.9 billion of repurchase authorization remaining.   The Board permitted the Company to repurchase approximately $8.6 billion of the Company's artificially inflated stock between December 2010 and July 2011.   Defendants caused the Company to make eight repurchases of the Company's stock at artificially inflated prices, the last of which was a staggering $1.1 billion repurchase in July 2011, immediately before the Company issued its disappointing third quarter 2011 financial results, revised its guidance downward yet again, and announced drastic changes in Company's strategy.

| Date of Board Authorization Repurchase Program | Period | Repurchased Shares | Average Price Per Share | Approximate Aggregate Cost |
|---|---|---|---|---|
| August 29, 2010 | - | - | - | - |
| | Dec-10 | 23,347,000 | $42.10 | $982,908,700 |
| | Jan-11 | 6,323,000 | $44.67 | $282,448,410 |
| | Feb-11 | 4,541,000 | $47.14 | $214,062,740 |
| | Mar-11 | 35,267,000 | $42.46 | $1,497,436,820 |
| | Apr-11 | 23,899,000 | $40.78 | $974,601,220 |
| | May-11 | 38,091,000 | $37.44 | $1,426,127,040 |

| | | | | |
|---|---|---|---|---|
| | Jun-11 | 59,658,000 | $35.71 | $2,130,387,180 |
| July 21, 2011 | Jul-11 | 30,214,000 | $35.88 | $1,084,078,320 |
| **Total:** | | **221,340,000** | **$38.82** | **$8,592,050,430** |

104. Defendants Apotheker, Lesjak, Livermore, Lane, Babbio, Hammergren, Baldauf, Thompson, Gupta, Andreessen, Banerji, Reiner, Russo, Senequier, and Whitman knew, or recklessly disregarded, that the Company's share price was inflated due to the recent misleading statements trumpeting the Company's webOS platform.  By the time the Company announced the repurchase authorization and executed the $1.1 billion repurchase in July 2011, the Board had either already decided to, or was anticipating the decision to, discontinue the webOS platform and to sell or spin-off the Company's PC division.  As such, defendants Apotheker, Lesjak, Livermore, Lane, Babbio, Hammergren, Baldauf, Thompson, Gupta, Andreessen, Banerji, Reiner, Russo, Senequier, and Whitman were aware that these forthcoming announcements would cause the Company's stock to tumble.  Nevertheless, these defendants allowed the Company to deplete its assets by paying large premiums to repurchase its own stock, despite knowing that the imminent announcement would cause the Company's stock to price drop significantly.

105. Defendants caused the Company to repurchase approximately 221,340,000 shares of its stock at an aggregate cost to the Company of approximately $8.6 billion during the Relevant Period.  Under the defendants' direction, the Company bought back its shares at a weighted average price of $38.82, substantially higher than HP's share price of $23.60 the day after the news broke.  The Company incurred real economic loss from the approximately 221,340,000 shares of HP stock the Company purchased at a weighted average price of $38.82 per share. The shares currently trade at between $24 and $25 per share.

### INSIDER SELLING

106. During this same period, while defendants were announcing additional buybacks and causing HP to buy back its shares at artificially-inflated prices, defendants Babbio, Lesjak, and Livermore, took the opportunity to sell their own shares of HP stock. These defendants, trading off material adverse information known to them but not to the investing public, profited themselves at the expense of other investors. Combined, defendants Babbio, Lesjak, and Livermore sold over $44 million worth of their Company stock during the Relevant Period as shown in the table below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds | Notes |
|---|---|---|---|---|---|
| BABBIO | 1/21/2011 | 2,046 | $47.50 | $97,185.00 | 10b5-1 plan adopted on 12/1/2010 |
| | 1/21/2011 | 15,812 | $47.50 | $751,070.00 | 10b5-1 plan adopted on 12/1/2010 |
| | | 17,858 | | $848,255.00 | |
| | | | | | |
| LESJAK | 12/1/2010 | 15,268 | $42.52 | $649,195.36 | 10b5-1 plan adopted on 11/29/2010 |
| | 1/4/2011 | 6,250 | $43.50 | $271,875.00 | 10b5-1 plan adopted on 11/29/2010 |
| | 1/5/2011 | 15,000 | $44.00 | $660,000.00 | - |
| | 1/11/2011 | 15,000 | $46.00 | $690,000.00 | 10b5-1 plan adopted on 11/29/2010 |
| | | 51,518 | | $2,271,070.36 | |
| | | | | | |
| LIVERMORE | 11/24/2010 | 13,800 | $44.07 | $608,215.68 | - |
| | 1/5/2011 | 211,200 | $43.99 | $9,290,688.00 | 10b5-1 plan adopted on 12/6/2010 |
| | 1/11/2011 | 175,000 | $45.99 | $8,048,250.00 | 10b5-1 plan adopted on 12/6/2010 |
| | 1/14/2011 | 1,366 | $46.40 | $63,382.40 | 10b5-1 plan adopted on 12/6/2010 |
| | 1/18/2011 | 298,634 | $46.40 | $13,856,677.33 | 10b5-1 plan adopted on 12/6/2010 |
| | 1/21/2011 | 200,000 | $46.99 | $9,398,000.00 | 10b5-1 plan adopted on 12/6/2010 |
| | | 900,000 | | $41,265,213.41 | |
| | | | | | |
| TOTAL | | 969,376 | | $44,384,538.77 | |

107. As a director of HP, defendant Babbio was privy to material, non-public information concerning the viability of the Company's webOS platform.

Babbio is responsible for the false and misleading statements concerning the Company's financial performance and outlook, the alleged development of webOS-based hardware beyond the Company's mobile devices, and the Company's purported plans and commitment to integrate webOS across its other business segments and devices. Accordingly, Babbio engaged in insider trading activity at a time when he knew adverse material, non-public information.

108.   While in possession of this knowledge, defendant Babbio sold 17,858 shares of his personally held HP stock for proceeds of $848,255. Babbio's sales were timed to maximize profit from HP's then artificially inflated stock price. Babbio's sales are suspicious given that his stock sales represented over 30% of his holdings as demonstrated by the chart below:

| | |
|---|---|
| Shares Sold During Sales Period ("SP") | 17,858 |
| Shares Remaining After Sales | 40,659 |
| Total Shares Before Sales | 58,517 |
| **Total Proceeds from Sales** | **$848,255.00** |
| **% of Total Ownership Sold During SP** | **30.52%** |

109.   As HP's CFO, defendant Lesjak was privy to material, non-public information concerning the viability of the Company's webOS platform. In fact, Lesjak made false and misleading statements concerning the Company's financial performance and outlook, alleged development of web-OS based hardware beyond the Company's mobile devices, and its purported plans and commitment to integrate webOS across its other business segments and devices. Accordingly, Lesjak engaged in insider trading activity at a time when she knew adverse material, non-public information.

110.   While in possession of this knowledge, defendant Lesjak sold 51,518 shares of her personally held HP stock for proceeds of $2,271,070. Lesjak's sales were timed to maximize profit from HP's then artificially inflated stock price. Lesjak's sales are suspicious given that her stock sales represented over 69% of her holdings as demonstrated by the chart below:

| Shares Sold During SP | 51,518 |
| Shares Remaining After Sales | 23,052 |
| Total Shares Before Sales | 74,570 |
| Total Proceeds from Sales | $2,271,070.36 |
| % of Total Ownership Sold During SP | 69.09% |

111.   As a director and Executive Vice President of HP, defendant Livermore was privy to material, non-public information concerning the viability of the Company's webOS platform.   Livermore is responsible for the false and misleading statements concerning the Company's financial performance and outlook, the alleged development of web-OS based hardware beyond the Company's mobile devices, and the Company's purported plans and commitment to integrate webOS across its other business segments and devices.   Accordingly, Livermore engaged in insider trading activity at a time when she knew adverse material, non-public information.

112.   While in possession of this knowledge, defendant Livermore sold 900,000 shares of her personally held HP stock for proceeds of $41,265,213. Livermore's sales were timed to maximize profit from HP's then artificially inflated stock price.   Livermore's sales are suspicious given that her stock sales represented over 90% of her holdings as demonstrated by the chart below:

| Shares Sold During SP | 900,000 |
| Shares Remaining After Sales | 89,798 |
| Total Shares Before Sales | 989,798 |
| Total Proceeds from Sales | $41,265,213.41 |
| % of Total Ownership Sold During SP | 90.93% |

113.   While these defendants sold most of their personally-held Company stock pursuant to 10b5-1 plans, these plans were adopted after the misconduct had already begun.   As such, defendants Babbio, Lesjak, and Livermore knew that HP's stock was artificially inflated due to their improper statements when adopting the 10b5-1 plans, and cannot avail themselves of the inference that they did not trade on the material adverse, non-public information.

**DEFENDANTS' FAILURES IN CONNECTION WITH THE SELECTION OF DEFENDANT APOTHEKER AS HP'S CEO CONTRIBUTED TO THE DAMAGES SUFFERED BY THE COMPANY**

114. On August 6, 2010, HP announced the resignation of its then CEO, Chairman, and President, Hurd, after an investigation by the Board. Under Hurd's leadership, HP had experienced a significant turnaround in performance, more than doubling its share price during his tenure. Hurd is generally credited with rescuing HP after the Board had committed a series of strategic blunders and public relations disasters. According to HP, the Company's Standards of Business Conduct, for among other things, improprieties concerning his expense reports.

115. The market reacted negatively to Hurd's resignation. When the investing public learned of Hurd's resignation, HP's share price dropped 10% overnight. Hurd's resignation was untimely and costly to the Company as the Board granted Hurd a severance reportedly worth between $35 million - $40 million. In particular, the Company had just completed its $1.2 billion acquisition of Palm and its widely-publicized webOS software, which purportedly was going to rival Google's Android and Apple's iOS software. The next CEO of HP would be responsible for leading the Company into the uncharted territory of marketing and developing hardware with its newly-acquired webOS system. In short, it was imperative that the Board exercise due diligence and adequately vet potential candidates in making the crucial decision to replace Hurd as the Company's CEO. As discussed below, defendants Andreessen, Babbio, Baldauf, Gupta, Hammergren, and Thompson, who comprised the Board tasked with selecting the Company's CEO, failed miserably.

**A.  The Board Blindly Appoints Defendant Apotheker as HP's Next CEO**

116. Before the Board offered him the top job at HP, defendant Apotheker had been the CEO of the German company SAP, a position he held for a mere ten months. Apotheker resigned his post at SAP in February 2010 after upsetting customers in connection with an attempted price increase during the recession,

clashing with German unions about planned layoffs, and presiding over the Company's first revenue decline since 2003. Aside from his failed ten- month stint as SAP's CEO, Apotheker did not have any experience as a CEO (much less the CEO of a multi-national information technology company like HP), nor did he have any experience managing a hardware business akin to HP's biggest units. Accordingly, it was critical that the Board properly scrutinize Apotheker's qualifications and ability to lead HP as its top executive. However, defendants Andreessen, Babbio, Baldauf, Gupta, Hammergren, and Thompson failed to ensure that the Board inform itself or engage in any semblance of adequate due diligence prior to hiring Apotheker.

117. The Board effectively disregarded the Company's process for selecting the Company's next CEO, arguably a Board's single most important responsibility. The Board hired HP's next CEO without ever even meeting him. The Board formed a special "Search Committee" to identify potential replacements for Hurd, and the committee provided several candidates. However, due reportedly to "infighting" and interpersonal animosities, the Board refused to interview or even meet *any* of the candidates that the Search Committee provided. Indeed, the Board twice rejected the general committee's recommendations that the Board interview the candidates. When the Board voted to hire Apotheker as CEO, most of the Board members had never even met defendant Apotheker. "I admit it was highly unusual," one of the Board members told the *New York Times*. "But we were just too exhausted from all the infighting."[1]

---

[1] "Voting to Hire a Chief Without Meeting Him," *New York Times*, September 21, 2011.

**B.     The  Company  Struggles  Under  Defendant  Apotheker's  Uneven Direction**

118.   The Apotheker era began inauspiciously.   Defendant Apotheker initially refused to divulge his strategy for growing the Company's business.   In February 2011, Apotheker announced the launch of HP's new webOS platform structured  around  the  TouchPad  tablet  and  smartphones  operating  through  the webOS system.   As described above, Apotheker raved about the performance of the  HP's webOS software and stoked the fervor surrounding its webOS platform, only to backtrack on his public statements and pull the Company's webOS products merely months after its release.

119.   On August 18, 2011, defendant Apotheker confirmed reports that the Company planned to acquire Autonomy for upwards of $10.3 billion, representing a one-day premium to Autonomy shareholders of approximately 64%. Analysts agreed that HP had overpaid for Autonomy.  For example, analyst at Credit Suisse Securities (USA) LLC called the acquisition "costly" at a "whopping $10 billion" in its August 19, 2011 report.

120.   On the same day, Apotheker unveiled HP's strategy to spin-off or sell its $40 billion PC division.  This shocked investors because months earlier, the Company had touted its PC business as the "core to HP's strategy for the connected world."

121.     HP's  plans  to  explore  a  spin-off/sale  its  PC  division  and  its acquisition  of  Autonomy  were  unanimously  panned  by  analysts  and  investors alike.  In an August 29, 2011 analyst report, Indigo Equity Research derided both moves  as  "misguided,  stupid,  risky  and  expensive."    In  particular,  analysts criticized  defendant  Apotheker's  decision  to  announce  the  Company's  intent  to spin-off  or  sell  the  PC  business  before  a  final  decision  had  been  made,  which would  leave  the  Company  vulnerable  to  competitors  likely  to  exploit  HP's indecisiveness as a selling tool against it.  The analysts' concerns proved true.  In an article entitled "Hewlett-Packard: Worst Board Ever?," *The Wall Street Journal*

quoted an HP corporate customer weighing a purchase of high-end HP computers as stating "I've put that all on hold … It appears that they're lost right now."

122.   It would only take a couple months for the Board to realize that a spin-off/sale of HP's PC division was poorly conceptualized.   On October 27, 2011, approximately two months after disclosing its intent to spinoff/sell the PC division, the Company announced that it was scrapping its plans to spinoff/sell its PC division.   Defendant Lesjak explained that the reduced purchasing power and elimination of joint branding opportunities would cost HP an estimated $1 billion a year.   According to *The Wall Street Journal* reported entitled "H-P to Keep PC Business," the estimated $1 billion cost of a spin-off or divesture was in stark contrast to a previous internal review that "pegged the total cost of a spinout at around $300 to $400 million."

123.   According to a *New York Times* article published on September 21, 2011, discussing the PC division Spin-off and the Autonomy deal, defendant Apotheker was "the driving force behind both moves… [and] broached the ideas of both a major transaction and a potential spinoff at a meeting of H.P. directors in April."

**Amidst Intensifying Scrutiny from Investors, the Board Replaces Defendant Apotheker with Defendant Whitman**

124.   Apotheker lasted just eleven months as HP's CEO (though he was able to cause significant harm to the Company during his short stint).   On September 22, 2011, the Company fired Apotheker and announced that defendant Whitman would replace him as the Company's third CEO in a little over two years. In that time Apotheker presided over a collapse of over 50% in HP's market value and oversaw three reductions in earnings forecasts and missed projections.

125.   The *New York Times* described defendant Apotheker's failed tenure as follows:

Almost from the day Mr. Apotheker arrived, H.P.'s operating results declined with dizzying speed, climaxing a few weeks ago when H.P.

announced that it might — or might not — sell or spin off its PC business, with its $30 billion in revenue and strong market share.

H.P. also said it was abandoning its once-vaunted operating system and its much promoted new tablet computer. The unexpected announcements highlighted what critics say are Mr. Apotheker's weaknesses: little experience in H.P.'s dominant hardware businesses, including printers and PCs; an inability to communicate effectively; and a tendency to make major decisions only in consultation with Mr. Lane, and not with H.P.'s managers.

"The company is coming apart at the seams," said one person familiar with H.P.'s operations. "Because they may or may not be selling the PC business, the enterprise side is completely frozen. The business customers who buy tens of thousands of these machines along with support contracts are shutting them out. Dell and Lenovo are all over these accounts. They're having a field day. H.P. is self-destructing."

126.   Defendant Whitman admitted that HP had "confused the market pretty dramatically on August 18 [2011]" when the Company announced its intent to spinoff/sell its PC division.  Whitman also noted that "it's hard to know what the hangover effect of August 18 is."  Whitman acknowledged that the Company was "in a crisis mode," Lane said this –not Whitman and that the Company had not been run "as effectively, and as a team as it should be."

127.   Those Director Defendants who voted to hire defendant Apotheker sight unseen abdicated their most important responsibility: they deliberately chose not to inform themselves, when information was readily available, before committing the corporation to a decision as consequential as the choice of CEO.

These Defendants' intentional neglect of arguably the Board's most crucial responsibility directly caused much of the damage to HP discussed herein.

## DAMAGES INCURRED BY HP

128. As a result of the Individual Defendants' improprieties, HP disseminated false and misleading public statements and committed massive corporate waste.   HP's reputation for technical excellence, reliability, and truthfulness has suffered greatly and irreparably. Adding to the enormous of financial damage the Company has already incurred, HP is now the subject of at least one securities fraud class action.

129. As a direct and proximate result of the Individual Defendants' actions, HP has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred from overpaying for its own stock at artificially inflated prices;

(b)    costs incurred as a result of the abandoned $1.2 billion acquisition;

(c)    costs from lost business and lost business opportunities due to the defection of HP's Personal Systems Group customer base resulting from the ill-considered divestiture announcement;

(d)    costs incurred from compensation and benefits paid to the defendants who breached their duties to HP;

(e)    costs incurred from hiring and compensating an unvetted and unqualified CEO in defendant Apotheker;

(f)    tangible and intangible costs to the Company from the rapid and inexplicable turnover in CEOs; and

(g)    actual and potential costs incurred from defending and paying any settlement and/or judgment in the class actions for violations of federal securities laws.

130.   Among the quantifiable damages as a result of defendants' misconduct is the increased cost of capital.  Cost of capital describes the cost of generating funds to support the Company's operations through sales of equity and issuance of debt.  As a result of the Company's strategic reversals concerning its PC division, management turnover, and Company stock repurchases, credit rating agencies have downgraded HP's credit rating, which has increased and will continue to increase the Company's cost of capital.  For example, in December 2011, the Company was forced to pay a higher borrowing cost in a $3 billion bond offering after Standard & Poor's reduced the Company's corporate credit and senior unsecured ratings two levels from A to BBB+.  After the downgrade, the Company was forced to pay higher interest rates on its debt security, including a twenty-five basis point higher spread on five-year debt, and a twenty basis point higher spread on ten-year debt. In total, the Company is now required to pay an additional $40.5 million on its debt instruments. Further, Moody's Investors Service downgraded its investment-grade credit ratings on HP, citing the Company's share repurchase activity and strategic inconsistency.  These damages will continue to accrue to HP until the Company's debt securities reach their maturity.

## DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

131.  Each Individual Defendant, by virtue of his or her position as an officer and/or director, owed to the Company and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of HP, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who

were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of HP's Board.

132.   The Individual Defendants breached their duties of loyalty and good faith by disseminating false and misleading statements about the Company's financial status, strategic plans, and progress in implementing webOS and developing webOS-enabled devices, or by allowing other defendants to do so.

133.   Those Director Defendants that voted to select defendant Apotheker as CEO of HP, without taking care to meet him or ascertain what his plans for the Company would be once he became CEO, breached their duties of loyalty and good faith by refusing to inform themselves adequately about this crucial information when such information was readily available.

134.   The Individual Defendants also breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to dramatically overpay for its own stock at the same time the Company's stock was inflated due to the improper statements detailed herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  In addition, as a result of defendants' illegal actions and course of conduct, the Company is now the subject of a class action lawsuit that alleges violations of securities laws.  As a result, HP has expended, and will continue to expend, significant sums of money.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

135.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

136. During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of HP, regarding the Individual Defendants' management of HP's operations; and (ii) enhance the Individual Defendants' executive and directorial positions at HP and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

137. The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

138. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

139. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

140. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing,

substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

141.   Plaintiffs bring this action derivatively in the right and for the benefit of HP to redress injuries suffered, and to be suffered, by HP as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  HP is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

142.   Plaintiffs will adequately and fairly represent the interests of HP in enforcing and prosecuting its rights.

143.   Plaintiffs were shareholders of HP at the time of the wrongdoing complained of, have continuously been shareholders since that time, and are current HP shareholders.

144.   HP's Board at the time of the filing of this action consisted of the following fourteen individuals: defendants Andreessen, Apotheker, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Senequier, Thompson, and Whitman.  Plaintiffs have not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because a Majority of the Board Faces a Substantial Likelihood of Liability for Making False and Misleading Statements**

145.   Defendant Apotheker faces a substantial likelihood of liability for breach of his fiduciary duty and violation of section 10(b) of the Exchange Act. Apotheker, as CEO of HP, was ultimately responsible for the Company's operations, financial statements, and internal controls.  However, in conscious disregard of his fiduciary duties, Apotheker made improper statements regarding the Company's strategy, financial status, and business prospects. As defendant

Apotheker knew or recklessly disregarded, his statements concerning the Company's webOS platform and its business prospects were false and misleading. Because Apotheker faces a substantial likelihood of liability for violations of federal securities law, demand upon him is futile.

146.   Defendants Apotheker, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Senequier, Thompson, and Whitman also face a substantial likelihood of liability, for violation of section 20(a) of the Exchange Act, because they exercised actual power and control over defendants Apotheker, Lesjak, and Bradley when they made the foregoing false and misleading statements.  These defendants allowed such statements to be made and to influence the market, which had the effect of artificially inflating the value of the Company's stock.  In addition, these defendants' exercised their power and control over the Company's repurchase program, and exercised such power and control to facilitate the repurchase of nearly $8.6 billion of its own stock at inflated prices.  In particular, defendants Andreeseen, Baldauf, Gupta, Reiner, Russo, and Whitman, as members of the Technology Committee, were directly responsible for knowing the status of the Company's technology strategies, including its strategy concerning webOS.  These defendants, therefore, knew that the acquisition of Palm was a failed strategy and that the Company was planning on terminating its webOS hardware business, including its much-touted TouchPad.  In addition, defendants Baldauf, Banerji, Gupta, Senequier, and Thompson served on the Company's Audit Committee and, under the terms of the operative Audit Committee charter, had a responsibility and obligation to review and discuss HP's public filings with the U.S. Securities and Exchange Commission ("SEC"), including the misleading statements described herein.  Accordingly, Andreesssen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Senequier, Thompson, and Whitman face a substantial likelihood of liability for making false and misleading statements, and demand upon them is futile.

147.   Defendants Apotheker, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Senequier, Thompson, and Whitman also face a substantial likelihood of liability for making and allowing the other Individual Defendants to continue to make improper statements about the Company's financial status.   Each of these defendants knew, or in reckless disregard for their fiduciary duties, should have known about the Company's business health, in particular, the Company's inability to successfully implement webOS from the Palm acquisition into a viable product line, and instead that the Company planned to discontinue this line of business.   Nevertheless, Apotheker, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Senequier, Thompson, and Whitman either participated in or allowed the improper statements to continue.

**Demand Is Excused because a Majority of the Board Faces a Substantial Likelihood of Liability for Causing or Permitting the Company to Repurchase Its Stock at Artificially Inflated Prices. Further, the Decision to Cause or Permit the Repurchases is Not a Valid Business Judgment**

148.   Defendants Apotheker, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Senequier, Thompson, and Whitman also face a substantial likelihood of liability for wasting millions of dollars of the Company's assets.   Each of these defendants authorized and failed to halt HP's massive $8.6 billion repurchase of its own stock.   At the same time that Apotheker, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Senequier, Thompson, and Whitman authorized and refused to halt the repurchase, they knew the non-public inside information concerning the Company's decision to close down its webOS business, the very business that these same defendants were touting as being a major growth drive for the Company.   No reasonable person would have paid the price that these defendants caused the Company to pay for HP stock if they possessed the non-public information these defendants had.   Accordingly, Apotheker, Andreessen,

1 Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo,

2 Senequier, Thompson, and Whitman are liable for the amount that the Company

3 wasted and a demand as to these defendants would be futile.

4     149.  Defendants Andreessen, Apotheker, Babbio, Baldauf, Banerji, Gupta,

5 Hammergren, Lane, Livermore, Reiner, Russo, Senequier, Thompson, and

6 Whitman's decision to authorize a $10 billion share repurchase on July 21, 2011, is

7 not protected by the business judgment rule.  At the time of this decision, these

8 defendants were extremely reckless in authorizing a massive repurchase at the

9 same time that the Company was set to announce a major decision that they knew

10 would decrease the Company's stock price -- the decision to discontinue all plans

11 for webOS products and potentially to exit the entire consumer business through a

12 sale or spin-off of the Personal Systems Group segment.  Nevertheless, not only

13 did the Board authorize the additional repurchase, it allowed the Company to

14 continue to purchase its stock at artificially inflated prices.  In fact, in July 2011,

15 HP acquired over $1 billion of its own stock, at the same time that the Individual

16 Defendants, including the Board, knew that the Company would soon announce

17 that it was exiting the consumer business and that its $1.2 billion purchase of Palm

18 was a failure.  Such reckless conduct is at a minimum a breach of the Board's duty

19 of care.   Accordingly, the Board's decision to authorize the repurchase is not

20 protected by the business judgment rule.

21 **Demand Is Excused Because Defendants Andreessen, Babbio, Baldauf, Gupta,**
22 **Hammergren, and Thompson - Together with Inside Director Defendant**
**Apotheker, a Majority of the Board - Face a Substantial Likelihood of**
23 **Liability for Their Decision to Elect Apotheker as HP's CEO**

24

25     150.  Defendants Andreessen, Babbio, Baldauf, Gupta, Hammergren, and

26 Thompson had a duty and responsibility to adequately inform themselves of the

27 candidates to replace Hurd as the Company's CEO.  In fact, defendants were

28 merely required to engage in good faith due diligence in carrying out their most

important duty as a director – to select the Company's top executive.  This they did not do.  Defendants consciously disregarded their duty of loyalty and due care owed to the Company and its shareholders by deliberately refusing to interview or personally meet any of the candidates.  Indeed, many of the Board members did not even meet defendant Apotheker prior to his appointment as the Company's CEO.  Instead, defendants succumbed to infighting within the Board and allowed internal animosities to supersede their fiduciary duties to act in good faith and in the best interest of the Company.  Accordingly, defendants Andreessen, Babbio, Baldauf, Gupta, Hammergren, and Thompson face a substantial likelihood of liability for their utter disregard of their fiduciary duties, and any demand upon them is futile.

151.   In addition, defendants Andreessen, Babbio, Baldauf, Gupta, Hammergren, and Thompson's decision to appoint Apotheker as the Company's CEO cannot pass muster as a valid exercise of business judgment.  The search and hiring process undertaken by the defendants was wholly inadequate and inherently unreliable as these defendants failed to engage in any due diligence, and deliberately neglected to inform themselves of information material to their decision.  Accordingly, these defendants cannot seek refuge under the business judgment rule for their patently uninformed and haphazard decision to hire Apotheker as HP's CEO.

**Demand Is Excused Because a Majority of the Board Is Not Independent of Defendant Apotheker**

152.   A majority of the Board is not independent of defendant Apotheker.  The Board selected Apotheker to replace Hurd as the CEO of HP.  Apotheker then personally selected five new directors to serve on the Board:   defendants Banerji, Reiner, Russo, Senequier, and Whitman.  In playing a direct role in selecting these five directors, Apotheker usurped the role of the Board's Nominating and Governance Committee in evaluating and considering potential Board members.

1    Nevertheless, the Board took no action to reprimand Apotheker or include the

2    Nominating and Governance Committee in the selection of new Board members.

3    Rather, defendants Lane and Apotheker personally called defendants Banerji,

4    Reiner, Russo, Senequier, and Whitman and invited them to the Board.  The Board

5    demonstrated it will not take action to censure or penalize Apotheker, who faces a

6    substantial likelihood of liability for making the numerous false statements

7    explained above, let alone vote in favor of initiating action against them.

8    Accordingly, a reasonable doubt is raised regarding whether the Board can

9    independently consider a demand.

10         153.  In addition, Lane, another director that played an active role in

11   selecting these new members of the Board, has known defendant Apotheker since

12   the 1990s when Lane hired Apotheker.  Lane has admitted to having a close

13   relationship with Apotheker.  Indeed, in his short time at HP, Lane has used his

14   influence with Apotheker to benefit his position as managing partner of Kleiner

15   Perkins Caufield & Byers ("Kleiner Perkins"), a venture capital investment firm.

16   In February 2011, HP acquired Vertica Systems, a Kleiner Perkins investment.

17   Lane had personally sponsored Kleiner Perkins investment in Vertica Systems.

18   Thus a demand on Lane would be a futile act.

19         154.  Further, defendant Andreessen is a director at Stanford Hospital and

20   Clinics.  During the 2010 fiscal year, HP contributed over $7.5 million to Stanford

21   Hospital and Clinics.  Defendant Apotheker, as CEO of the Company, controls its

22   donations.  Accordingly, Andreessen is also not independent of Apotheker, rending

23   a demand upon him futile.

24   **Demand Is Excused Because Defendants Babbio, Lesjak, and Livermore Face**

25   **a Substantial Likelihood of Liability for Their Improper Insider Trading**

26         155.  Defendants Babbio, Lesjak, and Livermore sold HP stock under

27   highly suspicious circumstances.  Babbio, Lesjak, and Livermore, as directors

28   and/or officers of the Company, possessed material, non-public Company

information and used that information to benefit themselves.  Babbio, Lesjak, and Livermore sold stock based on this knowledge of material, non-public Company information regarding, among other things, the viability of the Company's webOS platform, the significant issues hampering the Company's development of webOS mobile devices, including the TouchPad, and the Company's financial performance and outlook.  Accordingly, Babbio, Lesjak, and Livermore face a substantial likelihood of liability for breach of their fiduciary duty of loyalty.  Any demand upon Babbio, Lesjak, and Livermore is futile.

**Additional Reasons Demonstrating that a Demand on the Board Is an Exercise in Futility, and Therefore, Excused**

156.   Moreover, the acts complained of constitute violations of the fiduciary duties owed by HP's officers and directors and these acts are incapable of ratification.

157.   Each of the defendant directors of HP authorized and/or permitted the improper statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the improper statements and are principal beneficiaries of the wrongdoing alleged herein and thus, could not fairly and fully prosecute such a suit even if such suit was instituted by them.

158.   HP has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against any defendants who were responsible for that wrongful conduct, to attempt to recover for HP any part of the damages HP suffered and continues to suffer thereby.

159.   Even though the Individual Defendants have had full knowledge of the claims and causes of action raised by plaintiffs and time to act on that knowledge, the Board has failed to seek to recover for HP for any of the wrongdoing alleged.

160.   Plaintiffs have not made any demand on the other shareholders of HP to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     HP is a publicly held company with nearly 2 billion shares outstanding and thousands of shareholders;

(b)     making demand on such a number of shareholders would be impossible for plaintiffs who have no reasonable way of finding out the names, addresses, or phone numbers of shareholders; and

(c)     making demand on all shareholders would force plaintiffs to incur excessive expenses, assuming all shareholders could be individually identified.

**COUNT I**

**Against Defendants Apotheker, Lesjak, and Bradley for Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder**

161.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

162.   Defendants Apotheker, Lesjak, and Bradley made and caused the publication of misleading statements regarding the financial health of the Company and its business prospects in connection with its webOS platform.   These defendants knew or recklessly disregarded the fact that the foregoing statements were false and misleading.

163.   Defendants Apotheker, Lesjak, Livermore, Lane, Babbio, Hammergren, Baldauf, Thompson, Gupta, Andreessen, Banerji, Reiner, Russo, Senequier, and Whitman knowingly, willfully and acting with scienter permitted and facilitated HP's repurchase of 221,340,000 shares of its own stock at a cost to the Company of approximately $8.6 billion when they knew that HP's stock was substantially artificially inflated due to the misleading statements alleged herein.

The repurchases of HP stock were intended to and did manipulate and/or deceive HP and its shareholders.

164.   The wrongful conduct alleged herein was continuous, connected, and on-going.   These defendants' misconduct resulted in continuous, connected, and on-going harm to the Company.

165.   Defendants Apotheker, Lesjak, and Bradley violated section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated  thereunder in that they:

(a)      employed devices, schemes, and artifices to defraud;

(b)      made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      engaged in acts, practices, and a course of business that operated as a fraud or deceit upon HP stock.

166.   HP has suffered damages by repurchasing the Company's stock at prices these defendants, knew were artificially inflated as a result of the false and misleading statements.   But for these defendants' misconduct, the Company would not have purchased its stock at the prices it paid, or at all, if it had been aware that the market prices had been artificially and falsely inflated by the misleading statements.

## COUNT II

### Against the Director Defendants for Violation of Section 20(a) of the Exchange Act

167.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

168.   The wrongful conduct alleged herein was continuous, connected, and on-going during the Relevant Period from the first improper statement on February 22, 2011, to August 18, 2011, when the truth was revealed.   Defendants Apotheker, Livermore, Lane, Babbio, Hammergren, Baldauf, Thompson, Gupta, Andreessen,

Banerji, Reiner, Russo, Senequier, and Whitman's misconduct resulted in continuous, connected, and on-going harm to the Company.

169. Defendants Apotheker, Livermore, Lane, Babbio, Hammergren, Baldauf, Thompson, Gupta, Andreessen, Banerji, Reiner, Russo, Senequier, and Whitman, exercised actual power and control over the Company's general affairs, including the content of public statements disseminated by HP and the timing and amount of stock repurchases, and exercised their actual power and authority to control or influence one another, and defendants Apotheker, Lesjak, and Bradley in connection with the specific conduct that violated section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder as alleged above.

170. Director Defendants Baldauf, Banerji, Gupta, Senequier, and Thompson, as directors and as members of the Audit Committee exercised actual power and control over the Company's general affairs, including the content of public statements disseminated by HP and the timing and amount of stock repurchases, and exercised their actual power and control over defendant Apotheker, as HP's CEO, defendant Lesjak, as HP's CFO, and defendant Bradley as the Company's Executive Vice President of PSG, in connection with the specific corporate policies and conduct that violated section 10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

171. Defendant Apotheker, as HP's CEO and as a director, had the power and/or ability to, and did, directly or indirectly, control or influence the Company's general affairs, including the content of public statements disseminated by HP and the timing and amount of stock repurchases, and had the power and/or ability to, and did, directly or indirectly, control or influence defendants Lesjak and Bradley in connection with the specific corporate policies and conduct that violated section 10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

172. Each of these defendants is jointly and severally liable under section 20(a) of the Exchange Act to the same extent as defendants Apotheker, Lesjak,

and Bradley for the primary violations of section 10(b) and Rule 10b-5 promulgated thereunder, as set forth herein.  Apotheker, Livermore, Lane, Babbio, Hammergren, Baldauf, Thompson, Gupta, Andreessen, Banerji, Reiner, Russo, Senequier, and Whitman did not act in good faith.

## COUNT III

### Against the Individual Defendants for Breach of Fiduciary Duty

173.  Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

174.  As alleged in detail herein, the Individual Defendants by reason of their positions as officers and directors of HP and because of their ability to control the business and corporate affairs of HP, owed the Company fiduciary obligations of due care and loyalty, and were and are required to use their utmost ability to control and manage HP in a fair, just, honest, and equitable manner.

175.  The Individual Defendants violated their duty of care and loyalty by making or tacitly permitting the improper statements in the Company's press releases, conference calls, and other public disclosures.

176.  Defendants Apotheker, Lesjak, and Bradley, as officers of HP owed the Company the highest duty of loyalty and care. However, in breach of their fiduciary duties, these defendants knew, recklessly disregarded, or were grossly negligent in not knowing and making improper statements that concealed: (i) HP's announced business model centered on webOS was a fabrication – the Company never had any concrete plan or operational strategy to leverage webOS across its "extensive portfolio" and scale of products and services in a strategically beneficial manner.; (ii) the webOS platform, including the TouchPad and webOS phones, and the Company's PSG segment was not central to HP's business model, and webOS would not be integrated across the Company's entire product line; (iii) that the inefficacy of TouchPad hardware rendered the webOS operating system ineffective and unprofitable, and the development of the TouchPad was marred by significant

performance and reliability issues underscored by missed delays, missed benchmarks, and deadlines ; and (iv) in light of the above, they had no reasonable basis to make positive statements about HP's financial results and business prospects.  Accordingly, Apotheker, Lesjak, and Bradley breached their duties of care, good faith, and loyalty.

177.  Defendants Apotheker, Livermore, Whitman, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Reiner, Russo, Senequier, and Thompson as directors of HP owed the Company the highest duty of loyalty. However, in breach of their fiduciary duties, these defendants knowingly or recklessly caused or permitted the improper statements that concealed: (i) HP's announced business model centered on webOS was a fabrication – the Company never had any concrete plan or operational strategy to leverage webOS across its "extensive portfolio" and scale of products and services in a strategically beneficial manner.; (ii) the webOS platform, including the TouchPad and webOS phones, and the Company's Personal Systems Group segment was not central to HP's business model, and webOS would not be integrated across the Company's entire product line; (iii) that the inefficacy of TouchPad hardware rendered the webOS operating system ineffective and unprofitable, and the development of the TouchPad was marred by significant performance and reliability issues underscored by missed delays, missed benchmarks, and deadlines; and (iv) in light of the above, they had no reasonable basis to make positive statements about HP's financial results and business prospects.  Accordingly, these defendants breached their duties of good faith and loyalty.

178.  Defendants Apotheker and Lesjak also breached their fiduciary duties by directing or permitting the Company to repurchase approximately $8.6 billion of the Company's stock at inflated prices.  At the time these repurchases were effectuated, Apotheker and Lesjak knew, recklessly disregarded, or were grossly negligent in not knowing, that the value of the Company's stock was significantly

inflated due to their false and misleading statements concerning the viability of the Company's webOS platform.  Nevertheless, in breach of their duty of loyalty to the Company and its shareholders, these defendants caused or allowed the Company to waste its corporate assets and pay a significant premium to buy-back the Company's stock.

179.   The Director Defendants breached their duty of loyalty by authorizing the additional $10 billion to the Company's repurchase program and allowing the Company to execute a repurchase of approximately $8.6 billion of the Company's stock at prices they knew, or in reckless disregard of their duties did not know, were artificially inflated.  Accordingly, the Director Defendants breached their duty of good faith and loyalty.

180.   The Audit Committee Defendants breached their fiduciary duty of loyalty by knowingly or recklessly allowing the Company to make improper statements in its public filings,   press releases, and earnings conference calls concerning the Company's financial health, business prospects, and forward guidance.  Additionally, this constituted a violation of the duties of the members of the Audit Committee under its Charter.

181. In addition, defendants Andreessen, Babbio, Baldauf, Gupta, Hammergren, and Thompson who elected defendant Apotheker as CEO of HP violated their fiduciary duty of due care and loyalty to use their utmost ability to control and manage HP in a fair, just, honest, and equitable manner.  In conscious disregard of their fiduciary duties, these defendants failed to adequately evaluate or assess Apotheker's qualifications, personally interview or inquire about his credentials, or otherwise inform themselves about his plans for the Company when such information was readily available.

182.   Defendants Babbio, Lesjak, and Livermore breached their duty of loyalty by selling HP stock on the basis of the knowledge of the improper information described above before that information was revealed to the

Company's shareholders.  The information described above was proprietary, non-public information concerning the Company's current and future business prospects.  It was a proprietary asset belonging to the Company, which defendants Babbio, Lesjak, and Livermore used for their own benefit when they sold HP common stock.

183.  As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

184.  Plaintiffs, on behalf of HP, have no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Waste of Corporate Assets

185.  Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

186.  As detailed below, the Individual Defendants diverted corporate assets for improper or unnecessary purposes.  Any benefits received by the Company cannot reasonably be viewed as fair exchange for the corporate assets and monies expended by HP.

187.  The Director Defendants wasted HP's corporate assets by authorizing and effectuating the repurchase of approximately $8.6 billion of the Company's stock at prices they knew, or recklessly were unaware, were artificially inflated. Causing or permitting a public company to repurchase its stock at artificially inflated prices was improper and unnecessary, and no person of ordinary sound business judgment would view this exchange of consideration as fair or reasonable.

188.  The Individual Defendants also wasted corporate assets by paying improper compensation, bonuses, and severance to certain of its executive officers and directors, breaching their fiduciary duty, exposing HP to civil liability, and causing the Company to incur potentially millions of dollars in legal costs.  The handsome remunerations paid to wayward fiduciaries who proceeded to breach

1  their fiduciary duties to the Company was improper and unnecessary, and no

2  person of ordinary sound business judgment would view this exchange of

3  consideration for services rendered as fair or reasonable.

4      189.   As a result of the waste of corporate assets, the Individual Defendants

5  are liable to the Company.

6      190.   Plaintiffs, on behalf of HP, have no adequate remedy at law.

7  ### COUNT V

8  **Against the Individual Defendants for Unjust Enrichment**

9      191.   Plaintiffs incorporate by reference and reallege each and every

10  allegation set forth above, as though fully set forth herein.

11      192.   Defendants Babbio, Lesjak, and Livermore sold HP stock while in

12  possession of material, adverse non-public information that artificially inflated the

13  price of HP stock.  As a result, Babbio, Lesjak, and Livermore profited from their

14  misconduct and were unjustly enriched through their exploitation of material and

15  adverse inside information.

16      193.   At the time of the Company's false and misleading statements and all

17  relevant times stated herein, the Individual Defendants received bonuses, stock

18  options, stock appreciation rights, and/or similar such compensation from HP in

19  breach of their fiduciary duties.  The Individual Defendants profited at the expense

20  and to the detriment of HP by accruing the substantial compensation and

21  remunerations while engaging in conduct in contravention of their fiduciary duties

22  owed to the Company. The corporate monies obtained by the Indvidual Defendants

23  were intended to compensate and to reward them for fulling their duties owed in

24  their official capacity, and, thus, were unjustifiably pilfered by these defendants

25  from the corporate coffers.

26      194.   To remedy the Individual Defendants' unjust enrichment, this Court

27  should order all defendants so enriched to disgorge all proceeds the Individual

28  Defendants received from their bonuses, stock options, and insider selling.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs, on behalf of HP, demands judgment as follows:

A.      Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.      Directing HP to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect HP and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

1.      a proposal to strengthen the Company's oversight and controls over its stock repurchase program;

2.      a proposal to strengthen the Company's controls over public disclosures;

3.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

4.      a provision to permit the shareholders of HP to nominate at least three candidates for election to the Board;

5.      a proposal to strengthen the Board's supervision of the Company's financial reporting process, including the internal audit and control functions;

6.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

7.      a proposal to formalize the qualification process for HP's officers and directors and C-level executives; and,

- 65 -

8.     a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal controls, and auditing matters.

C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiffs on behalf of HP have an effective remedy;

D.     Awarding to HP restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants,

E.     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: April 11, 2012

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
FELIPE J. ARROYO
SHANE P. SANDERS
KEVIN S. KIM

KEVIN S. KIM

600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsumeda.com
farroyo@robbinsumeda.com
ssanders@robbinsumeda.com

1

kkim@robbinsumeda.com

2

THE BRISCOE LAW FIRM, PLLC
WILLIE BRISCOE

3

8117 Preston Road, Suite 300
Dallas, TX 75225

4

Telephone: (214) 706-9314
Facsimile: (214) 706-9315
wbriscoe@thebriscoelawfirm.com

5

6

POWERS TAYLOR LLP
PATRICK POWERS

7

Campbell Centre II
8150 N. Central Expressway

8

Suite 1575
Dallas, TX 75206

9

Telephone: (214) 239-8900
Facsimile: (214) 239-8901
patrick@powerstaylor.com

10

11

Attorneys for Plaintiffs

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

719513

27

28

VERIFICATION

I, Ernesto Espinoza, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Consolidated Verified Shareholder Derivative Complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated:_____4-9.2012_____

_____
ERNESTO ESPINOZA

<u>VERIFICATION</u>

I, Larry Salat, hereby declare as follows:

I am the plaintiff in the within entitled action.  I have read the Consolidated Verified Shareholder Derivative Complaint.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 04/11/2012

_____
LARRY SALAT

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2012, I authorized the electronic filing of the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

I hereby certify that on April 11, 2012, I caused to be served a true copy of the foregoing document to the non-CM/ECF participants indicated on the attached Non-CM/ECF service list by delivering it in the manner provided in Rule 5(b) of the Federal Rules of Civil Procedure, by depositing at San Diego, California, in the U.S. Mail the foregoing document in a sealed envelope with postage thereon fully prepaid.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 17, 2012.

KEVIN S. KIM

*In re Hewlett-Packard Co. S'holder Derivative Litig.*,
No. 8:11-cv-01454-AG-(RNBx)

**Non-CM/ECF Service list**

COUNSEL FOR PLAINTIFFS

THE BRISCOE LAW FIRM, PLLC
WILLIE BRISCOE
8117 Preston Road, Suite 300
Dallas, TX 75225
Telephone: (214) 706-9314
Facsimile: (214) 706-9315
wbriscoe@thebriscoelawfirm.com

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON (174882)
110 West A Street, Suite 750
San Diego, California 92101
Telephone: (619) 230-0063
Facsimile:  (619) 255-1856
frankj@johnsonandweaver.com

*Counsel for plaintiffs*

POWERS TAYLOR LLP
PATRICK POWERS
Campbell Centre II
8150 N. Central Expressway
Suite 1575
Dallas, TX 75206
Telephone: (214) 239-8900
Facsimile: (214) 239-8901
patrick@powerstaylor.com

*Counsel for plaintiff Larry Salat*

COUNSEL FOR DEFENDANTS

WILSON, SONSINI, GOODRICH
& ROSATI
Steven M. Schatz
650 Page Mill Road
Palo Alto, CA 94304
Telephone-(650) 320-4856
sschatz@wsgr.com

*Counsel for defendant Catherine A.
Lesjak*

GIBSON, DUNN &
   CRUTCHER LLP
Dean J. Kitchens
Daniel S. Floyd
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

*Counsel for nominal defendant
Hewlett-Packard Company*

SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Garrett J. Waltzer
525 University Ave., Suite 1100
Palo Alto, CA 94301
Telephone: (650) 470-4540
Facsimile: (650) 798-6519
garrett.waltzer@skadden.com

*Counsel for defendants Ann M.
Livermore, Raymond J. Lane,*

*Lawrence T. Babbio, Jr., John H.
Hammergren, Sari M. Baldauf, G.
Kennedy Thompson, Rajiv L. Gupta,
Marc L. Andreessen, Shumeet
Banerji, Gary M. Reiner, Patricia F.
Russo, Dominique Senequier, and
Margaret C. Whitman*

MUNGER, TOLLES &
  OLSON, LLP
Brad D. Brian
Gregory J. Weingart
Laura D. Smolowe
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9100
Facsimile: (213) 687-3702
Brad.Brian@mto.com
Gregory.Weingart@mto.com
Laura.Smolowe@mto.com

*Counsel for defendant Leo Apotheker*